12 F.3d 1292
 62 USLW 2428, 17 Employee Benefits Cas. 1934
 Lucinda BIXLER, Administratrix of the Estate of Vaughn
Archie Bixler, Deceased; Heather Bixler, a minor,
by Lucinda Bixler, her guardian
v.
CENTRAL PENNSYLVANIA TEAMSTERS HEALTH & WELFARE FUND; James
C. Burns, Chairman and Trustee ad litem; William Baum,
Secretary and Trustee ad litem; Vincent Dagen, Trustee ad
litem; Edward Watkins, Trustee ad litem; John R.
Kleinfelter; Administrator; Drivers Inc.; Charles E. Welsh,
Lucinda Bixler, Administratrix of the Estate of Vaughn
Archie Bixler, Deceased; Lucinda Bixler, in her
own right; Heather Bixler, a Minor, by
Lucinda Bixler, her guardian,
Appellants.
 No. 93-7048.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 2, 1993.
Decided Dec. 28, 1993.
 
 Pamela G. Shuman (argued), Angino & Rovner, Harrisburg, PA, for appellants.
 J. Kitridge Fegley, Jack G. Mancuso (argued), Brumbach, Mancuso & Fegley P.C., Reading, PA, for appellees Central Pennsylvania Teamsters Health & Welfare Fund, James C. Burns, William Baum, Vincent Dagen, Edward Watkins, and John R. Kleinfelter.
 Stephen D. Shawe, Frances Taylor (argued), Shawe & Rosenthal, Baltimore, MD, Michael A. Finio, Goldberg, Katzman & Shipman, Harrisburg, PA, for appellees Driver, Inc. and Charles E. Welsh.
 Before STAPLETON, HUTCHINSON and ROTH, Circuit Judges.
 OPINION OF THE COURT
 ROTH, Circuit Judge:
 
 
 1
 Lucinda Bixler appeals from a district court order granting summary judgment in favor of the defendants Central Pennsylvania Teamsters Health and Welfare Fund (the "Fund") and Drivers, Inc. This case concerns the source and scope of an ERISA fiduciary's duty to one of its beneficiaries. We hold that a direct action for breach of fiduciary duty exists in the "other appropriate equitable relief" clause of ERISA Sec. 502(a)(3)(B), 29 U.S.C. Sec. 1132(a)(3)(B) (1988 & Supp.1991).[1] Because the district court did not rule on Mrs. Bixler's breach of fiduciary duty claim against Drivers and the factual record is incomplete in that regard, we will affirm in part, reverse in part, and remand for further proceedings.
 
 I.
 
 2
 In December, 1990, Lucinda Bixler's husband Vaughn died of a massive heart attack. During the previous fifteen years, Mr. Bixler worked for Drivers, a firm engaged in the service of supplying truck drivers to other companies, and was a member of Teamsters Local 776. For some time prior to his death, Mr. Bixler and his family received medical, disability, and life insurance through the Fund, as designated in the collective bargaining agreement negotiated between his union and his employer.
 
 A. The Fund
 
 3
 The Fund is an employee welfare benefit plan within the meaning of Sec. 3(1) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1002(1). The Fund is a multiemployer benefit trust, jointly administered by employer and union trustees. It is designed to accept contributions from its employer members, on behalf of their employees, pursuant to their collective bargaining agreements. The Fund offers a number of plans, each with a different level of benefits and corresponding cost to the contributing employer. Drivers, and thus the Bixler family, belonged to what was designated as Plan No. 10.
 
 
 4
 Unfortunately for Mr. Bixler and his family, his illness and eventual death occurred during a period of bargaining impasse. The relevant collective bargaining agreement was set to expire on August 31, 1990. Under that agreement, the Fund could not raise the required rate of employer contribution. However, several months prior to the end of the agreement, the Fund notified Drivers that it intended to raise the monthly contribution from $165 to $277 per employee once the agreement expired. This increase applied to all employers obtaining coverage under Plan No. 10.
 
 
 5
 As the August 31 deadline approached, Drivers and the union attempted, but failed, to reach a new agreement. One reason for this failure was the union's desire to maintain benefit coverage through the Fund at the increased cost and the employer's refusal to do so. The parties negotiated a brief extension of the collective bargaining agreement until September 11. On August 30, 1990, the union notified the employees, including Mr. Bixler, of this extension and informed them that their benefits coverage would be extended until September 15. After that date, the union's letter explained, Drivers was to have no further obligation to pay into the Fund.
 
 
 6
 Despite the extension, the parties were unable to reach an agreement. After September 15, Drivers ceased being a contributing member employer of the Fund. During a further period of negotiations, however, Drivers tendered, and the Fund agreed to hold in escrow, a payment equivalent to the original--but now insufficient--contribution of $165 per employee. This payment purported to cover the benefit period from September 15 through October 15, although it was made at a non-conforming rate.[2] The Fund agreed to temporarily hold the payment at the union's request, and the union, in turn, hoped to persuade the employer to satisfy the shortfall. If not, the Fund agreed that all 92 of Drivers' employees--as a group, but not individually--could remit the $112 shortfall through their employer in order to make a conforming contribution.
 
 
 7
 Neither possibility came to pass, and the September payment, along with an identical payment for October, was returned to Drivers. Drivers, in turn, forwarded the $165 monthly contributions to each employee.[3]
 
 
 8
 The Fund allows individual employees to continue their coverage under certain circumstances, pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") amendments to ERISA, 29 U.S.C. Secs. 1161-1168. Once the collective bargaining agreement expired and the employer ceased to contribute at the conforming rate, these provisions came into play. Thus, on October 5, 1990, the Fund mailed COBRA notices to all of Drivers' employees, advising them of their right to continue their benefits coverage individually, at their own cost. Specifically, the letter read:
 
 
 9
 Your employer has failed to remit payment to the Central Pennsylvania Teamsters Health & Welfare Fund for the month of Sept 1990. The Health & Welfare Fund cannot process any claims on your behalf until this payment is made.... Due to the recent continuation of coverage or COBRA amendment, you may be eligible to selfpay [sic] health & welfare coverage for a period of -36- months.... This coverage has a current premium of $272.30 per month.... You must inform the fund office of your decision to self pay [sic] by 12/05/90.
 
 
 10
 Appellants' Appendix ("Appellants' App.") at 26. It is undisputed that the Bixlers neither elected nor remitted payment for the COBRA coverage offered through the Fund.
 
 B. Drivers
 
 11
 As negotiations continued to be unproductive, Drivers went forward with its intent to institute a new benefits plan for its employees. In response, the union called a strike beginning on November 7, in which the vast majority of employees, including Mr. Bixler, participated. Just as Drivers' withdrawal from the Fund had been a "qualifying event" under COBRA, triggering its provisions, so was the strike. Thus, once the new benefits program became effective on November 15, Drivers sent COBRA notices to its striking employees, offering them the opportunity to purchase continuation coverage through the new program. Like the Fund, Drivers provided a sixty day period during which employees could elect coverage. The letter bore the heading "NOTICE OF RIGHT TO GROUP HEALTH COVERAGE," and read as follows:
 
 
 12
 As you know, the company has implemented its proposed new health program. Under federal law (COBRA), you may elect to have your health coverage, at your expense.... If you decide that you want coverage, please indicate below and return this form to Drivers Inc.'s office within 60 days. IF THIS FORM IS NOT RECEIVED WITHIN THE 60 DAY PERIOD (JANUARY 26, 1991), YOU WILL NOT BE ELIGIBLE TO RECEIVE BENEFITS.
 
 
 13
 Appellants' App. at 519. Following a discussion of cost and payment options, the letter warned:
 
 
 14
 FAILURE TO PAY PREMIUMS WITHIN THE ABOVE DESCRIBED TIME CONSTRAINTS WILL RESULT IN A LOSS OF CONTINUATION COVERAGE. THERE IS NO REINSTATEMENT.
 
 
 15
 Id. at 520. Again, it is undisputed that the Bixlers neither elected nor remitted payment for the COBRA coverage offered through Drivers.
 
 
 16
 Mr. Bixler died on December 26, 1990, after the period for election of the Fund's COBRA coverage had closed, but only halfway through the election period for the coverage offered by Drivers. Both the Fund and Drivers disclaim liability for the payment of medical bills and death benefits.
 
 C. Procedural History
 
 17
 Mrs. Bixler brought this suit, in her own right and as administratrix of Mr. Bixler's estate and guardian of their minor daughter, to recover her husband's medical expenses and death benefits. As defendants she named the Fund, its four trustees and administrator, as well as Drivers and its general manager, Charles Welsh.
 
 
 18
 In her complaint Mrs. Bixler alleges that both the employer and the Fund wrongfully denied her husband medical coverage and engaged in repeated misrepresentations that prevented her from electing to continue the family's medical coverage through COBRA.[4] After a period of discovery, both defendants made motions for summary judgment, which were granted by the district court.
 
 
 19
 The district court first held that because the Fund's plans fell within the scope of ERISA, all equitable estoppel and common law fiduciary duty claims were preempted under the plain language of the statute. ERISA Sec. 514, 29 U.S.C. Sec. 1144. In addition, as the Fund is self-insured, the court found that claims based on state insurance law were preempted under the rule of FMC Corp. v. Holliday, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990).[5]
 
 
 20
 Addressing the claims surviving under ERISA, the court initially considered Sec. 409, the statute's fiduciary duty section.[6] While ERISA's civil enforcement section, Sec. 502(a)(2), permits a beneficiary to sue under Sec. 409,[7] the court held that such a suit would be in the nature of a derivative action. While Sec. 502(a)(2) authorizes "appropriate relief under section ," the language of Sec. 409 emphasizes that recovery runs to the benefit of the plan, rather than the individual plaintiff.
 
 
 21
 Because Mrs. Bixler sought recovery in her own right, the court chose to read her claims as though they were pleaded under Sec. 502(a)(1)(B). That section specifically provides that a beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan."[8] Thus, the court did not address whether the Bixlers were, in fact, injured by a breach of fiduciary duty. Rather, it focused on whether Mrs. Bixler had any entitlement to the benefits based upon compliance with the terms of the Plan. The court ruled against that entitlement on two grounds. First, it found that Mr. Bixler was not entitled to coverage as an employee of a contributing member employer, as Drivers had ceased making the required contributions as of September. Second, it found that the Bixlers were not entitled to coverage under COBRA, as Mrs. Bixler was aware of the COBRA notice and yet failed to elect the coverage. As such, the court held that the Fund was not liable.
 
 
 22
 With regard to Drivers, the court reasoned that "[w]hile a Sec. (a)(1)(B) claim may be properly asserted against an ERISA plan[,] it cannot be raised against an employer." Bixler v. Central Pa. Teamsters Health & Welfare Fund, No. 92-479, mem. op. at 10 (M.D.Pa. Jan. 14, 1993). The court did not address Mrs. Bixler's claims of breach of fiduciary duty and fraudulent misrepresentation, which arose from a conversation between Mrs. Bixler and Mr. Welsh about benefits during the election period for COBRA coverage offered by the employer. Instead, the court "[chose] to read plaintiffs' complaint as seeking to impose liability on Drivers for failure to make contributions to the Fund that, inter alia, caused the Fund to deny plaintiffs' claims." Id.
 
 
 23
 The court provided alternate grounds for its ruling in favor of the employer. First, ERISA Sec. 515 establishes that employers must make contributions as required under the terms of their collective bargaining agreements.[9] Yet Sec. 502(g)(2), which establishes the types of recovery available in a civil action for enforcement of that section, indicates that recovery accrues to the benefit of the plan. Because Mrs. Bixler sought benefits for herself, the court concluded that she was not a proper party to bring suit under Sec. 502(g).[10] In addition, the court noted that allegations that an employer improperly failed to contribute to a benefit plan during a period of bargaining impasse are most likely jurisdictionally barred by the National Labor Relations Act.[11] In fact, the union did file such charges with the National Labor Relations Board. See supra note 2. As such, the court dismissed the claim against Drivers.
 
 II.
 
 24
 This case arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Secs. 1001-1461 (1988 & Supp.1991). The district court had jurisdiction under 28 U.S.C. Sec. 1331 and 29 U.S.C. Sec. 1132(f). Appellate jurisdiction for review of the district court's order granting summary judgment is predicated upon 28 U.S.C. Sec. 1291.
 
 
 25
 The standard of review applicable to a grant of summary judgment is plenary. "On review the appellate court is required to apply the same test the district court should have utilized initially." Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). A motion for summary judgment shall be granted if the court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In addition, "[i]nferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion. The non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." Goodman, 534 F.2d at 573.
 
 III.
 
 26
 Central to the district court's disposition of this case was the assumption that ERISA does not provide an individual cause of action for breach of fiduciary duty. As such, the court did not reach Mrs. Bixler's fiduciary claims, but rather defined her rights as based only upon her potential entitlement under the terms of the plan and the COBRA notices. It is not surprising that the court found proof of that entitlement to be lacking; ironically, Mrs. Bixler asserts that her failure to elect COBRA coverage was due to the defendants' failure to provide her with complete and accurate information that was material to her circumstance.
 
 A.
 
 27
 ERISA trustees must act in the interest of the employee benefit plans they serve; their duties and powers "reflect Congress' policy of 'assuring the equitable character' of the plans," Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 570, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447 (1985), and they are held accountable to the plans for their breaches. Yet in our emphasis upon the relationship between the trustee and the plan, we must not slight the simple fact that the plan participants and beneficiaries are precisely that--the intended beneficiaries of the relationship. Undoubtedly there will be instances in which a fiduciary's actions harm an individual beneficiary but do not harm the plan. Mrs. Bixler's allegations that the Fund provided misinformation about the continuation of her family's medical coverage and that Drivers failed to provide her with relevant information at all are examples of such instances.
 
 
 28
 Today we adopt the approach of Justice Brennan's concurrence in Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), and hold that "Section 502(a)(3) authorizes the award of 'appropriate equitable relief' directly to a participant or beneficiary to 'redress' 'any act or practice which violates any provision of this title' " including a breach of the statutorily created fiduciary duty of an administrator. 473 U.S. at 153, 105 S.Ct. at 3096.
 
 
 29
 In Massachusetts Mutual, the Supreme Court addressed the question whether an ERISA fiduciary could be held personally liable to a participant or beneficiary for extracontractual damages caused by the improper or untimely processing of benefits claims. The plaintiff there sued only under ERISA's fiduciary duty section, Sec. 409(a), and its civil enforcement section, Sec. 502(a)(2). In its application, the Court's holding is similarly limited. After examining the language of the statute, the Court concluded: "the entire text of Sec. 409 persuades us that Congress did not intend that section to authorize any relief [for breach of fiduciary duty] except for the plan itself." 473 U.S. at 144, 105 S.Ct. at 3091 (emphasis added).[12]
 
 
 30
 Justice Brennan, joined by three other justices, wrote separately to emphasize the limited reach of the majority opinion and to outline the proper approach for courts to take in construing other ERISA provisions. In full agreement that Sec. 409 does not authorize recovery to an individual, Justice Brennan explained that individual recovery for breach of fiduciary duty is available elsewhere in the statute: the "other appropriate equitable relief" clause of Sec. 502(a)(3).[13]
 
 
 31
 We find Justice Brennan's analysis to be persuasive. That analysis addresses the structure, legislative history, and purposes of ERISA, with the conclusion that ERISA administrators are "fully subject to strict fiduciary duties to participants and beneficiaries ... and to traditional trust law remedies for breaches of those duties." Id. at 151-52, 105 S.Ct. at 3095.
 
 
 32
 Section 404(a) is the touchstone for understanding the scope and object of an ERISA fiduciary's duties. The section is informative as to a trustee's accountability, for it establishes that a fiduciary "shall discharge his duties with respect to the interest of the participants and beneficiaries and--(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries." ERISA Sec. 404(a), 29 U.S.C. Sec. 1104(a). In carrying out those duties, the statute requires that a fiduciary satisfy a "prudent man" standard of care.[14]
 
 
 33
 These principles are given effect by Sec. 502(a)(3) which, in the language of the statute, authorizes the award of "appropriate equitable relief" directly to a participant or beneficiary to redress any act or practice which violates the provisions of ERISA. Of course, this relief is independent of that established in Sec. 409, authorizing recovery for breach of fiduciary duty on behalf of the plan. The question whether a beneficiary has a direct cause of action for breach of fiduciary duty depends, then, upon construction of both Sec. 502(a)(3), which, as seen above, generally authorizes individual civil actions for violations of the statute, and Sec. 404(a), which defines the scope of an ERISA fiduciary's duties. It is the latter section that demands our attention here.
 
 
 34
 Although the statute articulates a number of fiduciary duties, it is not exhaustive. Rather, Congress relied upon the common law of trusts to "define the general scope of [trustees' and other fiduciaries'] authority and responsibility." Central States Pension Fund, 472 U.S. at 570, 105 S.Ct. at 2840. Accord Eddy v. Colonial Life Ins. Co., 919 F.2d 747, 750 (D.C.Cir.1990). Justice Brennan explained that "Congress intended by Sec. 404(a) to incorporate the fiduciary standards of trust law into ERISA, and it is black-letter trust law that fiduciaries owe strict duties running directly to beneficiaries in the administration and payment of trust benefits." Massachusetts Mutual, 473 U.S. at 152-53, 105 S.Ct. at 3095-96 (footnote omitted).[15] Similarly fundamental in the law of trusts is the principle that "courts will give to beneficiaries of a trust the remedies necessary for the protection of their interests." Id. at 157, 105 S.Ct. at 3098 (quoting 3 Austin W. Scott, Law of Trusts Sec. 199, at 1638 (1967)) (footnote omitted).[16] Allowing an injured beneficiary recourse through the courts is, furthermore, essential to fulfilling the purpose of ERISA. In the words of Justice Brennan, the fundamental purpose of the statute is the "enforcement of strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interests of participants and beneficiaries." Id. at 158, 105 S.Ct. at 3098. Construing Sec. 502(a)(3) and Sec. 404(a) together, then, we conclude that Mrs. Bixler may bring a direct action for breach of fiduciary duty against the trustees and administrators of an ERISA plan.[17]
 
 B.
 
 35
 We are left with the question to what extent a fiduciary's alleged misinformation or failure to provide relevant information constitutes an actionable breach of fiduciary duty under Sec. 404(a). Drawing on the Restatement of Trusts and other non-ERISA sources of fiduciary principles, the D.C. Circuit has ruled that, once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance. This is so even if that information comprises elements about which the beneficiary has not specifically inquired. Eddy v. Colonial Life Ins. Co., 919 F.2d 747 (D.C.Cir.1990). We agree.
 
 
 36
 The facts of Eddy are quite similar to the facts at hand. Having learned that his group policy benefits were about to be terminated, Mr. Eddy contacted his insurer directly, informed them of his situation, and inquired about the possibility of maintaining his coverage. Because of alleged misinformation provided by the insurer, Mr. Eddy did not convert his benefits to an individual policy and thus lost his health coverage. While the district court ruled against Mr. Eddy on the ground that he inquired about a policy that was unavailable, the D.C. Circuit held that the fiduciary had a duty to inform him of alternate coverage that was available and appropriate to his circumstance, whether or not he had specifically inquired about it.
 
 
 37
 Acknowledging, as we do today, that ERISA's fiduciary duty section incorporates the common law of trusts, the appellate court found the duty to disclose material information "is the core of a fiduciary's responsibility." Id. at 750. As set forth in the Restatement (Second) of Trusts,
 
 
 38
 [The trustee] is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person.
 
 
 39
 Restatement (Second) of Trusts Sec. 173, comment d (1959).
 
 
 40
 This duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful. In addition, the duty recognizes the disparity of training and knowledge that potentially exists between a lay beneficiary and a trained fiduciary. Thus, while the beneficiary may, at times, bear a burden of informing the fiduciary of her material circumstance, the fiduciary's obligations will not be excused merely because she failed to comprehend or ask about a technical aspect of the plan. As the court concluded in Eddy:
 
 
 41
 The trial court found that Eddy called Chubb [the insurer], identified his employer, and stated that his coverage was ending.... As soon as Eddy did this, Chubb bore a fiduciary duty to convey correct and complete information material to Eddy's circumstance. This information would include the inapplicability of [some] provisions, the availability of [other] options, and the procedures for converting Eddy's health and life insurance coverage.
 
 
 42
 Eddy, 919 F.2d at 751.
 
 IV.
 
 43
 We agree that the Bixlers had no direct entitlement to the medical or death benefits under the terms of the collective bargaining agreement or the COBRA provisions. Yet as established above, a fiduciary's duties, and a beneficiary's corresponding remedies, are not limited to the terms of Sec. 502(a)(1)(B). Mrs. Bixler asserts that a series of conversations with personnel from both the Fund and Drivers encouraged her in the mistaken belief that the family was not eligible for continuation coverage. We now consider whether she has tendered sufficient factual support to withstand a motion for summary judgment on these breach of fiduciary duty claims.
 
 
 44
 As an ERISA fiduciary, the Fund may be held directly liable under Secs. 404(a) and 502(a)(3)(B) for a failure to provide complete and accurate material information to its beneficiaries. Mrs. Bixler claims that the Fund did not notify her of the opportunity to purchase continuation coverage. More specifically, she asserts that they incorrectly informed her that she could continue her coverage only if all 92 Drivers' employees chose to do so.
 
 
 45
 There is no dispute whether the Bixlers knew that their health coverage was ending in the fall of 1990. At her deposition, Mrs. Bixler admitted: "I knew as of September the 1st, you know, that [our coverage under the plan] was done." Recall, too, that the union had sent all employees notices about the termination of coverage in late August.
 
 
 46
 There is little more dispute over the Fund's COBRA notice. While Mrs. Bixler does not recall having seen it, she admits that it was sent to all employees and, moreover, that it was properly sent to her husband at the correct mailing address.
 
 
 47
 The most significant dispute centers around a series of telephone calls between Mrs. Bixler and the Fund. She claims to have made one call to the Fund, after receipt of the first $165 check from Drivers in lieu of its contribution. At that time, she was concerned that her family did not have health coverage, but she says that she was told that the family could not individually make up the shortfall in the employer's contribution. She also says that she was told nothing about her options under COBRA.[18]
 
 
 48
 Mr. Kleinfelter, the Fund's administrator, remembers these events quite differently. He recalls having had two conversations with Mrs. Bixler during the fall. The first occurred shortly after the mailing of the October 5 COBRA notice; the second occurred shortly after the $165 contribution was returned to the employees. According to Mr. Kleinfelter's sworn affidavit, the substance of the conversations was the same. During each, he told Mrs. Bixler that she could not individually pay the difference in the employer's contribution, but that she could, separately, purchase COBRA coverage on an individual basis.
 
 
 49
 Ordinarily this dispute of material fact would decide the matter for purposes of summary judgment, as we are required to view the evidence in the light most favorable to the non-moving party. During the course of her deposition, however, Mrs. Bixler conceded that Mr. Kleinfelter's recollection may be correct. When asked whether she remembered discussing the COBRA notice with Mr. Kleinfelter in October, she responded:
 
 
 50
 I don't. I really don't. I mean, I could have, but I don't remember at this time.
 
 
 51
 Appellants' App. at 203. Based upon this admission, and the additional admission that the COBRA notice was properly sent, we conclude that Mrs. Bixler has raised no genuine factual question whether the defendant Fund breached its fiduciary duty to provide her with complete and accurate information. Recently this Court held:
 
 
 52
 A non-moving party may not 'rest upon mere allegations, general denials, or ... vague statements....' If the non-moving party's evidence is 'merely colorable, ... or is not significantly probative, ... summary judgment may be granted.
 
 
 53
 Trap Rock Indus. Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890-91 (3d Cir.1992) (internal citations omitted). Accordingly, we will affirm the grant of summary judgment in favor of the Fund.
 
 
 54
 With respect to Drivers, we must, however, reach the opposite conclusion. Mrs. Bixler acknowledges that she received Drivers' COBRA letter in early December and that she understood it to be "about continuing with coverage." At the time, however, her husband was already in the hospital, and she mistakenly believed that this precluded him from being eligible for coverage. During her deposition, Mrs. Bixler explained her state of mind:
 
 
 55
 Q: And am I correct that you never elected any type of coverage through Drivers, Inc.?
 
 
 56
 A: No, because he ended up in the hospital.... [H]e was in the hospital then, and it just--we didn't get that far.
 
 
 57
 . . . . .
 
 
 58
 [T]hey had given him such a period of time to try and get the money together, and he had gone into the hospital, so he wasn't even eligible for anything then.
 
 
 59
 Appellees' App. at 56-57; Appellants' App. at 200. Acting on this belief, the Bixlers let the first month of the election period pass without electing coverage. Shortly after Mr. Bixler's death, but still well within the election period, Mrs. Bixler called Drivers to inquire about a death benefit. She spoke with Mr. Welsh, the company's general manager. Both she and Mr. Welsh remember that she asked whether there was a death benefit to which she was entitled and that Mr. Welsh advised her, after checking into the matter, that there was not. On the current record, this advice has not been shown to be inaccurate.[19]
 
 
 60
 Thus, we must assume, for present purposes, that Mrs. Bixler called with a specific question about a death benefit, and Mr. Welsh responded with a specific and accurate answer. In many situations this would suffice to meet the applicable fiduciary standard, and, indeed, this may be one of those situations. On the other hand, while the record is sketchy, we think there is evidence from which a trier of fact could infer that Welsh knew the Bixlers and their situation well enough to be aware of Mr. Bixler's hospitalization and the attendant medical expenses. If Mr. Welsh knew that Mr. Bixler's death left Mrs. Bixler with substantial unpaid medical expenses and that she could receive reimbursement for those expenses under Drivers' plan by signing and returning the COBRA notice that Welsh had sent to her husband, we believe the failure to advise her of the available benefits might be found to be a breach of fiduciary duty despite the fact that her inquiry was limited to the availability of a death benefit.
 
 
 61
 We acknowledge as well that there is a factual issue as to whether Drivers was acting in a fiduciary capacity and was aware of her circumstances when it advised Mrs. Bixler. The record does not establish whether Drivers was acting as the administrator of its new plan. However, for the purpose of reviewing a motion for summary judgment, this fact can be inferred from the fact that Drivers sent out its own COBRA notices.[20] Drivers' status, as a fiduciary or not, is a matter for the district court to decide on remand.
 
 
 62
 Similarly, we do not decide here whether a breach of fiduciary duty did occur. We merely hold that, if indeed Drivers was acting in a fiduciary capacity, it acted under a duty to convey complete and accurate information that was material to Mrs. Bixler's circumstance. Her circumstance was clearly broader than her inquiry. Whether "material information" may have included more than the mere fact that the company did not offer life insurance is an issue which the district court must also, if appropriate, resolve on remand.
 
 V.
 
 63
 For the foregoing reasons, we will affirm the grant of summary judgment in favor of the Fund, reverse the grant of summary judgment in favor of Drivers, and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 Section 502(a)(3), as codified at 29 U.S.C. Sec. 1132(a)(3), provides in full:
 A civil action may be brought-- ... (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.
 
 
 [2]
 The Union filed a claim against Drivers with the National Labor Relations Board ("NLRB"), alleging that its failure to contribute to the Fund at the increased rate constituted an unlawful unilateral change in the agreement. Dismissing the charges, the NLRB emphasized that the collective bargaining agreement expired on September 11, 1990, after its brief extension. As such, "the Employer did not act unlawfully when it continued to make Fund contributions for each employee at the $165 monthly rate." Letter from Francis W. Hoeber, NLRB Acting Regional Director, to Ira H. Weinstock, NLRB Case 4-CA-19233 (Nov. 28, 1990)
 
 
 [3]
 Mr. Bixler, in fact, received two checks, each in the amount of $165. The first was dated November 21, the second December 20. Along with each check was a letter from Charles Welsh, the general manager of Drivers, explaining that "[t]he Company has decided to send to each employee the $165.00 which represents the amount remitted to the fund on each employee's behalf." Appellees' Appendix ("Appellees' App.") at 11
 
 
 [4]
 In particular, she claims that the Fund: 1) failed to pay medical expenses and death benefits due under the terms of Plan No. 10, and 2) breached its fiduciary duty by misleading her in the belief that continuing coverage was available only to the group as a whole, rather than individually, through COBRA. With regard to Drivers, Mrs. Bixler claims that the employer: 1) is liable pursuant to an agreement implied in law to provide medical coverage, and 2) breached its fiduciary duty by failing to provide her with complete information about her options under COBRA
 
 
 [5]
 In FMC Corp., the Supreme Court held: "We read the deemer clause [Sec. 1144(b)(2)(B) ] to exempt self-funded ERISA plans from state laws that 'regulat[e] insurance' within the meaning of the saving clause [Sec. 1144(b)(2)(A) ]." 498 U.S. at 61, 111 S.Ct. at 409
 
 
 [6]
 Section 409, as codified at 29 U.S.C. Sec. 1109, establishes "Liability for Breach of Fiduciary Duty." It provides in part:
 Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary.
 
 
 [7]
 Section 502(a)(2), as codified at 29 U.S.C. Sec. 1132(a)(2), provides in full:
 A civil action may be brought-- ... (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title.
 
 
 [8]
 Section 502(a)(1)(B), as codified at 29 U.S.C. Sec. 1132(a)(1)(B), provides in full:
 A civil action may be brought--(1) by a participant or beneficiary-- ... (B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.
 
 
 [9]
 Section 515, as codified at 29 U.S.C. Sec. 1145, provides in full:
 Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms or conditions of such plan or agreement.
 
 
 [10]
 Section 502(g)(2), as codified at 29 U.S.C. Sec. 1132(g)(2), provides in part:
 In an action ... by a fiduciary for or on behalf of a plan to enforce section of this title in which a judgment in favor of the plan is awarded, the court shall award the plan--[the unpaid contributions, interest, fees, etc.].
 While Sec. 502(g)(2) refers to an action brought by the fiduciary, a beneficiary or participant would be able to enforce Sec. 515 in a suit brought under Sec. 502(a)(3).
 
 
 [11]
 See Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 549, 108 S.Ct. 830, 836, 98 L.Ed.2d 936 (1988) (holding that the remedy provided in Secs. 515 and 502(g)(2) "is limited to the collection of 'promised contributions' and does not confer jurisdiction on district courts to determine whether an employer's unilateral decision to refuse to make post-contract contributions constitutes a violation of the NLRA.")
 
 
 [12]
 See also 473 U.S. at 139 n. 5, 105 S.Ct. at 3088 n. 5 ("Because respondent relies entirely on Sec. 409(a), and expressly disclaims reliance on Sec. 502(a)(3), we have no occasion to consider whether any other provision of ERISA authorizes recovery of extracontractual damages.")
 
 
 [13]
 Indeed, Justice Brennan felt that the function of the one section informed the function of the other: "since Sec. 502(a)(3) already provides participants with 'other equitable relief ... to redress [ERISA] violations,' there is no need to construe Sec. 409 expansively in order to bring these individuals under the penumbra of 'equitable or remedial relief.' " 473 U.S. at 150, 105 S.Ct. at 3094
 
 
 [14]
 Section 404(a)(1)(B), as codified at 29 U.S.C. Sec. 1104(a)(1)(B), provides:
 a fiduciary shall discharge his duties with respect to the plan solely in the interest of the participants and beneficiaries and--
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.
 
 
 [15]
 See, e.g., S.Rep. No. 127, 93rd Cong., 2d Sess. (1973), reprinted in 1974 U.S.C.C.A.N. 4638, 4865 ("The fiduciary responsibility section, in essence, codifies and makes applicable to these fiduciaries certain principles developed in the evolution of the law of trusts"); H.R.Rep. No. 533, 93rd Cong., 2d Sess. (1973), reprinted in 1974 U.S.C.C.A.N. 4639, 4649 (identical language); H.R.Conf.Rep. No. 1280, 93rd Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 5038, 5106 (emphasizing that Sec. 502 permits beneficiaries to bring a "civil action to recover benefits due under the plan, to clarify rights to receive future benefits under the plan, and for relief from breach of fiduciary responsibility.") (emphasis added)
 
 
 [16]
 Cf. Coar v. Kamizir, 990 F.2d 1413, 1422-24 (3d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 179, 126 L.Ed.2d 138 (1993) (finding pre-ERISA common law remedies relevant as to the specific form of remedy available to a fund against a trustee for a breach of fiduciary duty under the statute)
 
 
 [17]
 Other courts of appeals have been similarly persuaded. See Warren v. Society Nat'l Bank, 905 F.2d 975, 978-83 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2256, 114 L.Ed.2d 709 (1991) (permitting monetary damages under Sec. 502(a)(3)(B) for breach of fiduciary duty). Accord Corcoran v. United Healthcare, Inc., 965 F.2d 1321, 1336 (5th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992) (acknowledging that Sec. 502(a)(3) permits a beneficiary to recover for a breach of fiduciary duty); Lorenzen v. Employees Retirement Plan of Sperry & Huchinson Co., 896 F.2d 228 (7th Cir.1990) (acknowledging but not deciding that monetary damages may be available under Sec. 502(a)(3)(B) for breach of fiduciary duty). See also Eddy v. Colonial Life Ins. Co., 919 F.2d 747, 750 (D.C.Cir.1990) (allowing individual action for breach of fiduciary duty and explaining that "the duties of an ERISA fiduciary are not limited by that statute's express provisions but instead include duties derived from common law trust principles.")
 
 
 [18]
 The confusion stems from the fact that the Fund essentially offered the employees two options for continuing coverage, although from different sources. First, for a brief time during the negotiations, the Fund suggested to the union that it would allow the employees, as a group, to satisfy the shortfall in the employer's contribution. Functionally, this would be done through employee contributions to the employer, which would then submit a conforming payment to the Fund. However, the employees soon resolved not do this. The offer for coverage under COBRA, required of the Fund under ERISA, was distinct from this earlier offer
 
 
 [19]
 The record does not include any documentation relating to any benefit plan or plans that Drivers had in place at the time of the Bixler/Welsh telephone conversations
 
 
 [20]
 Section 606(a)(4), as codified at 29 U.S.C. Sec. 1166(a)(4), requires the administrator of the plan to dispatch notices to beneficiaries of their rights upon the occurrence of various qualifying events