Russell **MUSHALLA**, Edward Szwast, Paul Fritzinger, Luis Garcia, Charles Fritz, Francisco Corral and Walter Boris, Jr., Plaintiffs,

v.

**TEAMSTERS LOCAL NO. 863 PENSION FUND, Defendant.**

**No. CIV A 99–3260.**

United States District Court, D. New Jersey.

June 28, 2001.

---

Stephen E. Klausner, Esq., Klausner Hunter & Rosenberg, Somerville, NJ, for Plaintiffs.

Kenneth I. Nowak, Esq., Vincent J. Nolan III, Esq., Zazzali, Fagella & Nowak, Newark, NJ, for Defendant.

## OPINION

WOLIN, District Judge.

This matter is opened to the Court on defendant's motion for summary judgment. The Court has considered the written submissions of the parties as well as the arguments of counsel made in open court on June 14, 2001. For the reasons discussed below, the Court will grant summary judgment in favor of defendant. Plaintiffs' complaint will be dismissed.

## BACKGROUND

Plaintiffs are seven former members of Teamsters Local No. 863 ("the Union") and participants in defendant pension fund. Defendant is Teamsters Local No. 863 Pension Fund ("the Fund" or "the Pension Fund"), a multiemployer pension fund governed by the Employee Retirement Income Security Act ("ERISA") and jointly administered by employer and union trustees. Pursuant to the Declaration of Trust Agreement establishing the Fund, the Fund is governed by ten Trustees, five selected by the Union and five selected by the participating employers. Daniher Aff. ¶ 3. Employers contribute to defendant Pension Fund at rates agreed to by employers and the Union and set forth in the collective bargaining agreements.

Plaintiffs were all employees of Wakefern, the warehouse and distribution company servicing Shop–Rite. Plaintiffs all commenced employment with Wakefern in the 1960's and all retired between December 19, 1997 and January 30, 1998. Plaintiffs' retirements entitled them to retirement benefits from the Pension Fund.

The amount of benefits is determined by a formula based on the number of years of service ("creditable service") multiplied by a factor predicated upon the last contribution rate for which contributions were received by the Fund prior to the employee's retirement. It is, therefore, common practice for employees who are at or near retirement age to wait to retire until an increase in the rate occurs. All plaintiffs in this case benefitted from an increase that took effect November 1, 1997; their benefits were based on a contribution rate of $3.17. Dft.'s Undisputed Facts, at II.D, II.E.

### 1. Changes in the Years of Creditable Service

The dispute at the heart of this case relates to the years of creditable service rather than to the contribution rate applied to the calculation of benefits. Until April 1, 1998, the cap on the maximum number of years of creditable service that the Fund would use in calculating pension benefits was thirty years for all participants, regardless of who their employer or bargaining unit was. *Id.* at III.A. Effective April 1, 1998, however, the number of years was increased to thirty-five. *Id.* at III.B. In other words, before April 1, 1998, an employee who worked more than thirty years received no credit for those additional years in the calculation of his pension benefits. After the change was instituted, every year up to thirty-five entitled the participant to additional benefits.

Plaintiffs' lawsuit charges that defendant breached its fiduciary duty to plaintiffs in failing to inform them that the change was being considered and that they might be eligible for increased benefits if they waited to retire.

The process leading to the increase in years of creditable service began in April 1997, when the Fund retained a legal consultant, Thomas J. Hart, of the Washington, DC, law firm of Slevin & Hart, P.C., to prepare a fully restated Pension Fund Plan. *Id.* at III.C. During the Summer and Fall of 1997, Hart reviewed the Plan and conferred with the Fund's manager, con-

sultant, actuary and attorney regarding the history, interpretation and administration of the Plan. Then, in October and November of 1997, Hart began drafting a new Plan. At that time, he did not consider changing the Plan's maximum of thirty years of creditable service. *Id.* at III.E.

The first draft of the restated Plan was completed on December 2, 1997, and a second draft was completed two days later. The second draft was distributed to the Plan's advisors—Joseph Tramontana (Union Business Agent and Fund Trustee), Anthony Miranda (Plan Consultant/Administrator), Stanley Weisleder (Fund Actuary) and Andrew Zazzali (Fund Attorney)—upon its completion. Neither the first, nor the second draft changed the years of creditable service. *Id.* at III.F, III.K.

In November 1997, Tramontana first conceived of the idea of increasing the years of creditable service as a means of stemming a growing tide of retirements among senior members of the Union. Tramontana believed that the growing number of retirements was linked to the fact that once a member reached thirty years of service, there was little incentive to continue working because his/her pension could only grow as a result of contribution rate increases and not for additional years of service. Tramontana, thus, decided to explore increasing the years of creditable service. *Id.* at III.G.; *see also* Tramontana Aff. ¶ 8.

Of his own accord and independent of the ongoing review and restatement of the Plan by Hart, Tramontana asked the actuary, Weisleder, to do a preliminary check into whether the Fund could afford to increase the cap on years of creditable service. Dft.'s Undisputed Facts, at III.H.; Tramontana Aff. ¶¶ 6,7,9. In response to Tramontana's request, Weisleder performed a computer calculation of the im-

pact on the Pension Fund if the number of years of creditable service was increased to forty-two years. In late November 1997, Weisleder reported to Tramontana and Miranda that he had found that the Pension Fund could not increase the cap to forty-two years, but that it might be able to increase it by a somewhat smaller amount, to say thirty-five years. Tramontana Aff. ¶ 9. However, Weisleder made clear that he had not done the analysis for thirty-five years and that, should the Fund consider such a change, he would have to do a fresh analysis. Dft.'s Undisputed Facts, at III.J.; Weisleder Aff. ¶ 6.

After Tramontana reviewed the December 4 draft, which, as previously noted, did not include any change in the years of creditable service, he spoke with Miranda, Zazzali and Hart regarding his idea. Tramontana was advised that an increase to thirty-five years would have to be approved by the actuary and the Trustees. Tramontana Aff. ¶ 12. Tramontana asked that Miranda propose having the draft revised to reflect an increase in the years of creditable service to thirty-five. Dft.'s Undisputed Facts, at III.L.

On December 8, 1997, Hart participated in a conference call with Miranda and Weisleder regarding the December 4 draft. On that call, Hart was asked to increase the maximum years of creditable service to thirty-five for the proposal being submitted to the Trustees at their scheduled December 9, 1997 meeting. *Id.* at III.M; *see also* Hart Aff. ¶ 6 ("It is my recollection that I was requested to modify the number of years of service recognized by the plan on or about December 8, 1997.... It is further my recollection that I was directed to make the change because the Union Trustees wished to have the matter of recognizing additional years of service discussed, and voted upon, by the Board as a whole."). Hart thus prepared

a revised version of the December 4 draft for the Trustees, which included, for the first time, the proposed increase in years of creditable service. Dft.'s Undisputed Facts, at III.N; *see also* Tramontana Aff. ¶ 13; Hart Aff. ¶¶ 6,7.

At the December 9, 1997, Trustees meeting, Hart reviewed with the Trustees the various changes that were proposed in his restated Plan. Regarding the increase in years of creditable service, Hart informed the Trustees that no actuarial study had been performed. Hart Aff. ¶ 7. The Trustees requested that the actuary and the Fund's attorney review the Fund's finances to determine whether the Fund had sufficient resources to accommodate this change. Dft.'s Undisputed Facts, at III.P.; Tramontana Aff. ¶ 18; Weisleder Aff. ¶ 10. The two were to report back to the Trustees before the next scheduled Trustees meeting on January 20, 1998. The Trustees did, however, approve the restated pension plan, including the increase in years of creditable service, "contingent upon the reviews of the Fund professionals and Trustees." Exh. E to Dft.'s Brief (Minutes of the December 9, 1997 Meeting of the Trustees); *see also* Hart Aff. ¶ 6 ("It was my understanding that the restatement was approved on this contingent basis because some Trustees felt that they might need additional time to review the document and because they looked to their advisers to report on any adverse cost implications..."); Tramontana Aff. ¶ 18 ("After a discussion of all of the revisions, the Trustees decided that they seemed acceptable, but they wanted the actuary and the Fund's own attorney to review the Fund's finances to see if the increase in years of creditable service from thirty to thirty-five was acceptable to the Plan."); Weisleder Aff. ¶ 10 ("The Trustees voted to approve the revisions, except that as to the proposed increase in years of creditable service, they asked me to do a

cost study and to report back to them before the January 20, 1998 meeting as to whether the change was feasible.").

Following the December 9, 1997 meeting, Weisleder reviewed the figures and found the proposal financially acceptable. The Trustees were informed of his findings at their January 20, 1998, meeting. Dft.'s Undisputed Facts, at III.R, S. The Trustees then discussed implementation issues, including when the change should become effective, *id.*, at III.S, how and when notice of the change had to be made, and the procedure for obtaining approval from the Internal Revenue Service. *See* Exh. F to Dft.'s Brief; *see also* Daniher Aff. ¶ 17 (At the January 20, 1998 meeting, the Trustees "discussed the issues of implementation: when would [the change] take effect, what type of notice they would have to give of the change, and when they would have to give notice in relation to the change."). Hart advised the Trustees that they had to give at least 60 days' notice. The Trustees, therefore, voted to approve the increase effective April 1, 1998. *See* Hart Aff. ¶ 8.

## 2. Plaintiffs' Inquiries and Knowledge Regarding Possible Plan Changes

As will become more clear in the legal analysis below, the success of plaintiffs' complaint turns in large part on the occurrence and timing of inquiries by plaintiffs regarding possible changes to the Plan. Therefore, the Court will lay out the dates and circumstances of each plaintiff's inquiries regarding possible increases in his retirement benefits.

It is worth noting here that each plaintiff has testified that he would have continued to work beyond his actual retirement date had he known that he would be eligible for increased benefits as a result of the change in years of creditable service.

Moreover, all plaintiffs were able to withdraw their retirement papers up until the day that they retired. Tscrpt. 18:2–7.[1] And, plaintiffs note that at least one member of the Union and beneficiary of the Pension Fund did withdraw his papers in order to take advantage of the increase in years of creditable service. Mushalla Dep. 45:1–18.

### A. Russell Mushalla [2]

During the fall of 1997, Mushalla, a shop steward, periodically asked Mariano whether there was going to be any increase in benefits provided under the Plan. According to Mushalla, the last time he made such an inquiry was on December 20, 1997. *See* Mushalla Dep. 24:1–6; Appendix to Deft.'s Brief, Exh. Q (Mariano Affidavit). On each occasion, up to and including December 20, 1997, Mariano indicated that no increases were contemplated at that time. Mushalla Dep. 23:20–24:15.

On December 7, 1997, at a meeting of the general membership of the Union, Tramontana announced that an increase in years of creditable service, from thirty to thirty-five, was under consideration. Mushalla was the only plaintiff present at this meeting. Tramontana also informed the membership that a buyout of approximately 200 Pathmark employees was being contemplated. He provided no other information regarding the buyout.

Mushalla personally spoke with Tramontana after the meeting in an effort to clarify certain points. Mushalla came away from the meeting and his conversation with Tramontana with the understanding that the change in years of creditable service was to apply only to Pathmark employees. How Mushalla came to that understanding is not apparent, however, from either his testimony or from the record. Mushalla testified that, after the meeting, he approached Tramontana and asked him if there was "anything in there for Shop–Rite in the near future." Mushalla Dep. 21:19–20. Mushalla testified more than once that, by this, he meant to ask whether there were any anticipated increases in the contribution rate, not whether there would be a change in the years of creditable service. Mushalla Dep. 22:5–7; 26:15–21; 40:1–16. Mushalla moreover testified specifically that he was not asking about the possibility of an increase in the years of creditable service.[3] Mushalla Dep.

1. Citations to the transcript of the June 14, 2001 oral argument are in the following form: Tscrpt. Page Number:Line Number(s). Citations to depositions transcripts are in the same format, e.g. Mushalla Dep. Page Number:Line Number(s).

2. Plaintiffs make much of the so-called vertical organization of the Union. In their vision of the Union's operation, Mushalla was the lynchpin that held the whole Union structure together. As shop steward, Mushalla represented the membership's grievances and concerns to the Union. He reported first to Daniel Mariano, who, when necessary, would take up issues with Tramontana. Defendant questions the truth of plaintiffs' assertion regarding the Union organization, pointing to the fact that there is no evidence in the record to support this contention. The Court notes that there is, however, support in the record for that proposition. A number of plaintiffs testified that they relied on Mushalla for their information regarding Plan benefits. In any case, the Court need only note that this issue of fact, while genuine is not material. As discussed *infra*, no plaintiffs, Mushalla included, made inquiry of defendant regarding increases in pension benefits after the date when "serious consideration" of the proposed change began.

3. There is one statement in Mushalla's deposition suggesting that he did inquire about the change in years of creditable service, but this was with respect to the Pathmark buyout only. Mushalla Dep. 41:5–42:1. It appears from the record that Mushalla never asked

22:5–13. Tramontana answered in the negative regarding changes in the contribution rate. Mushalla's last conversation with Tramontana regarding possible increases in pension benefits was at the December 7, 1997 meeting. Mushalla Dep. 25:15–24.

It appears that Mushalla was the only one in attendance at the meeting who came away with the understanding that the change in years of creditable service related to the Pathmark buyout and did not apply to all Plan participants. Others at the meeting understood that Tramontana was discussing two separate issues, and that the change in years of creditable service under consideration would affect all Union members. *See* Dft.'s Uncontested Facts, at IV.F–J; Appendix to Deft.'s Brief, Exh. R (Rufolo Affidavit); Exh. S (Cascarelli Affidavit); Exh. T (Betza Affidavit); Exh. U (O'Mara Affidavit).

Mushalla also asked Mariano about buyouts and increases in the contribution rates, but not about changes in the years of creditable service. His last inquiry of Mariano was no later than December 20, 1997. Mariano informed Mushalla that he did not know of any anticipated changes. Mushalla Dep. 24:1–15.

Mushalla submitted his retirement papers on November 11, 1997 and retired on December 26, 1997.

### B. Edward Szwast

Szwast testified that, on approximately a dozen different occasions during November and December 1997, he inquired of Daniel Mariano, a Union business agent and Fund Trustee, whether there was any chance that the pension amount would increase in the near future. Mariano replied,

about an increase in years of creditable service that would apply to him or to Wakefern

on each occasion, either that he did not know or that the pension was not going to go up. Szwast Dep. 41:3–11; 43:18–44:7.

Szwast also testified that he decided to retire in November 1997, effective January 1998, and that on November 19, 1997, he completed the paperwork for his retirement and submitted it to his shop steward, Mushalla.

Szwast retired on January 30, 1998.

### C. Paul Fritzinger

Fritzinger asked Mushalla, his shop steward, every week for several months before he decided to retire whether there would be any increase in the pension. Mushalla always answered in the negative, so Fritzinger ultimately decided to retire. He submitted his paperwork on August 12, 1997. After that, Fritzinger did not speak with any union business agents or business delegates regarding his benefits. Fritzinger Dep. 24:15–22. Fritzinger retired on December 19, 1997. There is no indication that Fritzinger made any inquiry of anyone, whether from the Union or the Fund, after his retirement.

### D. Luis Garcia

Garcia testified that he never made inquiry of any Fund or Union representative concerning possible changes to the Fund. Garcia Dep. 26:12–17. Before submitting the paperwork regarding his anticipated resignation, Garcia asked Mushalla several times whether there were going to be any increases in pension benefits. Mushalla told him no, that the pension was going to stay the way it was. Garcia Dep. 10:7–18; 11:2–12.

Garcia, therefore, submitted his retirement papers on August 12, 1997. Garcia

generally.

Dep. 20:9–11. Garcia asked Mushalla one last time, in September 1997, whether the benefits were going to increase. The answer was still the same. He did not ask again and he had no further conversations with Mushalla, or anyone else at the Union or the Fund, after September. Garcia Dep. 25:3–26:3. Garcia's retirement became effective on December 26, 1997.

### E. Charles Fritz

Fritz never made inquiry of anyone regarding possible changes in the Pension Fund or the benefits for which he was to become eligible. Fritz did testify that he was informed by his brother-in-law, Fritzinger, another plaintiff, during a card game, that there would be no increase in benefits. Fritzinger told Fritz that he knew this as a result of speaking to Mushalla. Fritz Dep. 24:7–10. Fritz learned this sometime between the middle of November and the middle of December. Fritz Dep. 8:21–9:9.

Fritz completed his paperwork for retirement on September 2, 1997 and he retired effective January 30, 1998.

### F. Francisco Corral

Corral never had any discussions with anyone at the Union or at the Fund regarding his pension benefits. Corral Dep. 15:11–15. Corral submitted his resignation paperwork on or about November 6, 1997, and retired December 26, 1997. Corral Dep. 8:7–12.

### G. Walter Boris, Jr.

Boris never inquired of anyone at the Fund or the Union regarding possible changes to his pension benefits. Boris Dep. 40:19–41:1. Boris did speak with Mushalla, his shop steward, and he checked the postings on the bulletin board at work to gauge whether any increase in benefits would be forthcoming. He deter-

mined that no increase was anticipated. Boris completed his paperwork for retirement on October 1, 1997, and for his pension on October 8, 1997. Boris Dep. 31:21–32:6; 44:14–22. Boris retired December 19, 1997.

### DISCUSSION

### 1. Standard for Summary Judgment

The standard for granting summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure has been stated frequently by the Court. *See Clawans v. U.S.*, 2000 WL 1887786, at *2–*3 (D.N.J. December 26, 2000); *Soto v. City of Newark*, 72 F.Supp.2d 489, 491–92 (D.N.J.1999); *Oakley v. Wianecki*, 1998 WL 329266, at *5–*6 (D.N.J. June 18, 1998). Therefore, the Court will only restate it briefly here.

Summary judgment is appropriate only if all the probative materials of the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Hersh v. Allen Prods. Co., Inc.*, 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). The Court must resolve all reasonable doubts in favor of the nonmoving party when determining whether any genuine issues of material fact exist. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983).

However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). If the moving party has made a properly supported motion for summary judgment, then the nonmoving party must come for-

ward with specific facts to show that there is a genuine issue of material fact for trial. *Id.* at 248, 106 S.Ct. 2505. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted). As such, summary judgment "may present the district court with an opportunity to dispose of meritless cases and avoid wasteful trials." *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130 (3d Cir. 1995) (citation omitted).

## 2. The Legal Background

This case involves complex issues regarding the organization of ERISA funds and the functions performed by and duties of the different players involved in the creation, administration and termination of those funds. To aid the reader in comprehending the Court's analysis, the Court will begin by sketching for the reader two relevant dichotomies established in the jurisprudence of ERISA and implicated in this case.

First, as noted above, defendant Pension Fund is a jointly managed, multiemployer pension fund. A multiemployer plan is one to which two or more unrelated employers contribute and which is maintained under one or more collective bargaining agreements. A common trust is used to hold contributions and pay benefits. Joseph R. Simone, Understanding ERISA 1996: An Introduction to Basic Employee Retirement Benefits 15 (Practising Law Institute, 1996). Multiemployer plans are also known as Taft–Hartley plans if they are collectively bargained, as this plan is. In the case of a Taft–Hartley plan, there is a joint board of trustees made up of representatives from the various employers as

well as "outside trustees," who are not from any of the participating employers. *Id.* at 19; *see also Washington Star Co. v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1504 (D.C.Cir.1984).

In contrast to the multiemployer plan, the single-employer plan is broadly defined as "any defined-benefit plan(as defined in section 1002(35) of this title) which is not a multiemployer plan." 29 U.S.C. § 1301(a)(15)(1994); *see also Hawkeye Nat'l Life Ins. Co. v. AVIS Indus. Corp.,* 122 F.3d 490, 499 (8th Cir.1997) (defining both multiemployer and single-employer plans). Single-employer plans are more common in large corporations that have a sufficient number of employees to justify such undertakings and the capital to fund them. Generally, with single-employer plans, the corporation's board of directors appoints an administrative committee to administer the plan and may sometimes appoint a separate committee to oversee the investment of plan assets.

A second relevant dichotomy recognized in the caselaw is that between fiduciary acts and ministerial acts. In the context of ERISA, "Congress has conferred fiduciary status on persons and entities by activity and not by label." Ronald J. Cooke, ERISA Practice and Procedure § 6.2 (2d Ed.2000). As such, it is "clear that one is a fiduciary only to the extent that he or she exercises one or more of the functions [set forth in the statute], which means that the same person may be a plan fiduciary for certain purposes, but not for others." *Id.*

According to § 3(21)(A) of ERISA, a person is a fiduciary with respect to a plan:

"to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposi-

tion of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

29 U.S.C.A. § 1002(21)(A).

In considering allegations of breach of fiduciary duty, "[t]he critical distinction that may be drawn from [the caselaw] is . . . between decisions under a plan and 'business decisions.'" Cooke, ERISA Practice and Procedure § 6.2. Amendment of a plan has routinely been held to be a business decision, rather than a fiduciary act of administration. *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); *Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); *Sutter v. BASF Corp.*, 964 F.2d 556 (6th Cir. 1992). Therefore, while a plan trustee is a named fiduciary according to ERISA, *see* 29 U.S.C.A. § 1103(a), "the plan trustee is a fiduciary only with respect to those functions that fall within the scope of ERISA § 3(21)(A)." James F. Jorden et al., Handbook on ERISA Litigation § 3.02[C] (2d ed.1999). Amending, altering or terminating a plan, therefore, does not trigger fiduciary duties regardless of who undertakes those actions.

### 3. Threshold Analysis

The parties disagree about the proper legal framework for deciding this case. Defendant contends that it is found in the Third Circuit opinion of *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533 (3d Cir. 1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997) (*"Fischer II"*). *Fischer II* defines when and how a fiduciary duty may attach in connection

with communication between an employer or plan sponsor and a beneficiary regarding possible changes in the plan's benefits. In brief, *Fischer II* holds that there is no duty of disclosure until a proposed amendment is under "serious consideration," and, even then, disclosure is only required in response to an inquiry by a beneficiary. The Court will discuss the "serious consideration" test in greater detail below.

Plaintiffs, for their part, endeavor to distinguish this case from *Fischer II* on a number of grounds, in order, presumably, to avoid the undesirable outcome compelled by *Fischer II* should the Court apply it here. The Court has found no cases in this Circuit (or any other for that matter) applying the *Fischer II* analysis in a suit against a multiemployer Fund rather than an employer. Therefore, the Court has expended considerable thought and devoted great care to its determination of the appropriate framework for analyzing this case. The Court has considered each of plaintiffs' arguments against applying *Fischer II* here, as well as some of its own. A discussion of those issues follows. ·

### A. Fiduciary Duty of Disclosure

First, plaintiffs ask the Court to look to a line of cases that addresses the duty of disclosure regarding existing plan benefits and to find the fiduciary duty established therein binding on this defendant. Specifically, plaintiffs argue that *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir.1993), should be "the focal point for the Court's consideration." Pltfs.' Brief, at 4. In *Bixler*, the Third Circuit considered the extent to which an employer's alleged misinformation or failure to provide relevant information constitutes an actionable breach of fiduciary duty under 29 U.S.C.A. § 1104(a). *Id.* at 1300. While at first blush, *Bixler* may appear to control here, a

close reading of the case reveals that *Bixler* deals with disclosure regarding *existing* plan benefits, which is considered a fiduciary act of plan administration. *Id.*

*Bixler* and its progeny, on which plaintiff likewise relies, are not relevant here for two reasons. First, the causes of action in those cases arose out of communications regarding existing plan benefits. *See, e.g., Jordan v. Federal Express Corp.,* 116 F.3d 1005 (3d Cir.1997) (finding issues of fact sufficient to survive summary judgment on question of whether administrator violated its duty to disclose by providing beneficiary with an incomplete explanation of the terms and conditions of his retirement benefit election under the plan's current terms); *Joyce v. RJR Nabisco Holdings Corp.,* 126 F.3d 166 (3d Cir.1997) (recognizing existence, under certain circumstances, of a duty on the part of ERISA fiduciaries to inform beneficiaries about benefits for which they are eligible regardless of whether beneficiary requests such information).

Plaintiffs allege here that defendant's communications regarding proposed benefits were misleading. To rely on cases where the communications at issue went to existing benefits, therefore, is inapposite. There is an obvious difference in the duty owed by an employer or an ERISA fiduciary to its beneficiaries in communications regarding existing versus proposed plan benefits. Indeed, plaintiffs conceded as much at oral argument. *See* Tscpt. 16:18–17:16; 20:4–12.

The following colloquys between plaintiffs' counsel and the Court demonstrate the shaky ground on which plaintiffs stand in asserting that *Bixler et al.* control here:

Mr. Klausner: Not, your Honor, may I respectfully suggest that the trustees, the minute they walk in the door, in the multi-employer context, lose their loyalty first to their employer. The minute they walk into the board room as a trustee of a multi-employer plan, their first and primary loyalty is to the beneficiaries of the plan and the trust, not the employer that's paying them to sit in the room.

The Court: Can I add something to that?

Mr. Klausner: Absolutely.

The Court: As to existing benefits. Right? As to existing benefits.

Mr. Klausner: That's what *Walling* stands for.

Tscrpt. 16:22–17:9.

The Court: Why do you want to disavow proposed plan benefit versus existing benefits?

Mr. Klausner: Because if it's a proposal, then I will not say to you that [defendant was] obligated to advise anyone.

Tscrpt. 20:4–8.

■ Second and relatedly, the *Bixler* cases implicate the dichotomy discussed above that distinguishes between plan-administration-related acts and business-oriented acts. Communicating with beneficiaries regarding the terms of the plan in effect at the time of the communication clearly falls within the rubric of plan administration and is, therefore, a fiduciary act. As discussed above, amending a plan is not a fiduciary act. It is a managerial or ministerial act that does not trigger any fiduciary duty on the part of the individual or individuals considering changes to the plan. Communications regarding possible changes, therefore, should not be held to the same standard as communications regarding existing benefits. *See* Jorden et al., Handbook on ERISA Litigation § 3.03[C] ("A fiduciary is liable only with respect to those disclosures that relate to its role or responsibility as a fiduciary.").

## B. Single-employer vs. Multiemployer Plans

Plaintiffs also attempt to distinguish this case from *Fischer II* on another basis, namely that the Fund is a jointly managed, multiemployer plan while the plan in *Fischer II* was a single-employer plan. As the reader will recall, the Court discussed the difference between the two types of plans *supra*.

Plaintiffs argue that the policy reasons undergirding the *Fischer II* approach should not apply here because,

> "[a]s a jointly administered staff-fund, defendant is not acting as an employer, which may have business justifications for not disclosing material information to eligible participants. Rather as fiduciaries [sic], it must act solely in the interest of participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries."

Pltfs.' Undisputed Facts, at ¶ 2.[4] In support of this assertion, plaintiffs cite 29 U.S.C. § 1104(a)(1), the statutory provision describing an ERISA fiduciary's duties.[5]

This argument has no validity in this Court because it was explicitly rejected by the Third Circuit in *Walling v. Brady*, 125 F.3d 114 (3d Cir.1997). In *Walling*, the Court of Appeals reversed a district court holding that a pension fund's trustees breached their statutory fiduciary duty in amending the pension fund plan to provide for an additional $100 per month payment.

*Id.* at 116–17. The District Court, relying on a Second Circuit opinion, based its decision largely on the same distinction between multi- and single-employer plans that plaintiffs ask this Court to make here. The Court of Appeals reversed, finding no "material difference in the administration of single- and multi-employer plans." *Id.* at 118. In so holding, the Third Circuit noted that "[a]ll employers in a multi-employer plan are collectively a single employer in the language of 29 U.S.C.A. § 1060," and that "Section 1002(16)(B) of ERISA uses the term 'plan sponsor' rather than 'employer,' indicating that the term 'sponsor' is meant to encompass more than single employers . . ." *Id.*

■ Therefore, whether the plan is a multiemployer plan or a single-employer plan is irrelevant to this Court's analysis. *See also Pope v. Central States Southeast and Southwest Areas Health and Welfare Fund*, 27 F.3d 211 (6th Cir.1994) (holding that rule that ERISA's fiduciary duty provision does not apply when employer decides to amend benefits plan applies to amendment of multiemployer plans as well as single-employer plans).

## C. Employer vs. Fund as Defendant

Finally, the Court admits that it was temporarily given some pause as to whether *Fischer II* applied here where plaintiffs are suing the Fund, and by extension, the Trustees, who are named ERISA fiduciaries. As already noted, in *Fischer II*,

---

4. The Court agrees with defendant that this argument is not properly categorized as an "undisputed fact." In truth, the quoted paragraph elucidates an argument made in plaintiffs' brief in opposition to defendant's motion for summary judgment. *See* Pltfs.' Brief, at 13–14. The Court has, thus, treated this as a contested legal argument in this matter rather than as a statement of fact.

5. 29 U.S.C.A. § 1104(a) provides, in pertinent part, that an ERISA fiduciary "shall discharge his duties with respect to the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries." Section 404(a)(1)(B), as codified at 29 U.S.C. § 1104(a)(1)(B), likewise provides: "[A] fiduciary shall discharge his duties with respect to the plan solely in the interest of the participants and beneficiaries . . ."

plaintiffs sued their employer, who was the plan sponsor, and not a named fiduciary.

The Court, however, finds a number of sources of support for the application of the *Fischer II* analysis in a suit against the Fund just as in a suit against an employer. First, the policy reasons that supported the Third Circuit's holding in *Fischer II* as to plan administrators apply with equal force in the case of trustees of a multiemployer fund such as defendant. *See Pope*, 27 F.3d at 213–14 ("As in cases involving single-employer plans, the policy encouraging employers to establish welfare benefit plans is served by permitting trustees of multi-employer plans to amend such plans without fiduciary considerations.") (citations omitted). Those policy reasons are discussed in greater detail below.

■ Second, the Court has made an extensive review of the caselaw and finds that it supports the conclusion that, in considering allegations of breach of fiduciary duty, employers and trustees are to be treated identically. *See, e.g., Lockheed Corp.*, 517 U.S. at 890, 116 S.Ct. 1783 ("[E]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify or terminate [benefit] plans" without incurring fiduciary obligations); *Walling*, 125 F.3d at 119 ("Because the Trustees were not administering the plan, their amendment was not a fiduciary act."); *Muse v. International Bus. Machines Corp.*, 103 F.3d 490, 494 (6th Cir.1996) ("A fiduciary is . . . generally not required to disclose changes in a benefit plan before it is adopted."); Jorden, et al., Handbook on ERISA § 3.03[C] ("ERISA does not generally require fiduciary to disclose change in benefit plan before adoption, with exception where employer is giving 'serious consideration' to implementing change.").

In fact, in a concurring opinion in *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), Justice O'Connor noted that "[u]nder these hybrid Taft–Hartley plans it is the plans' trustees, not the employers and the union, who are 'usually responsible for determining the types of benefits to be provided . . . and the level of benefits, although in some cases these are set in the collective bargaining agreement.' Multiemployer Study 22 (footnote omitted). See also GAO/HRD–85–58, Comptroller General's Report to the Congress, Effects of the Multiemployer Pension Plan Amendments Act on Plan Participants' Benefits, 37, App. I, Table 3 (June 14, 1985) (95% of 139 multiemployer plans surveyed provided that trustees set benefits)." *Id.* at 232–33, 106 S.Ct. 1018 (O'Connor, J., concurring).

■ The proper distinction, as noted by the Third Circuit in *Walling* and as discussed above, is that between the fiduciary-administrator and the employer-plan modifier. *Walling*, 125 F.3d at 119. It is firmly established by caselaw that when employers "wear two hats" as employers and administrators, "they assume fiduciary status *only when and to the extent* that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." *American Flint Glass Workers Union, AFL–CIO v. Beaumont Glass Co.*, 62 F.3d 574, 578 (3d Cir.1995) (*citing Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir.1990) (quotations omitted)) (emphasis added).

Plan amendment or modification does not trigger ERISA's fiduciary provisions. *Lockheed Corp.*, 517 U.S. at 890–91, 116 S.Ct. 1783; *see also Walling*, 125 F.3d at 119–20 (" 'Discretion' for the purpose of determining the applicability of fiduciary obligations means solely that the plan administrator is making a choice reserved to it by the plan document in administering

the plan, not tinkering with the plan document itself.").

The Trustees of a multiemployer plan, therefore, must have the same leeway as an employer in the context of a single-employer plan to consider amendments to the plan without risking a breach of fiduciary duty in the process. Therefore, for all of the reasons discussed above, the Court believes that the *Fischer II* analysis is properly applied in this instance and will proceed with that analysis.

### 4. *Fischer II* Analysis and Application

Having determined that the *Fischer II* "serious consideration" test applies here, the Court will now explain that test and the policy reasons behind it. Then, in the following section, the Court will apply that test to the facts at bar to determine whether defendant breached a fiduciary duty in failing to inform plaintiffs of the proposed change in benefits when plaintiffs inquired about same.

 *Fischer II* teaches that in the instant case, as in any case where the communication in question is a statement that no change in benefits is under consideration, "the only factor at issue is the degree of seriousness with which the change was in fact being considered." *Fischer II*, 96 F.3d at 1538. This factor controls the materiality test: "[T]he more seriously a plan change is being considered, the more likely a misrepresentation . . . will pass the threshold of materiality." *Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir.1993) ("*Fischer I*"). Serious consideration, therefore, forms the crux of the inquiry. *Fischer II*, 96 F.3d at 1538–39 (collecting cases); *see also Kurz v. Philadelphia Elec. Co.*, 994 F.2d 136, 140 (3d Cir.), *cert. denied*, 510 U.S. 1020, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993); *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1163–64 (6th Cir.1988) ("when serious consideration was given to implementing [improved benefits, the company] had a fiduciary duty not to make misrepresentations, either negligently or intentionally, to potential plan participants concerning the [change].").[6]

 Specifically, in *Fischer II*, the Third Circuit held that a company has a fiduciary duty as an ERISA plan administrator to provide truthful information in response to employee inquiries about possible changes to an employee pension benefit plan, once those changes are under "serious consideration." *Fischer II*, 96 F.3d at 1538–39.[7] This Court now holds

---

6. Plaintiffs do not argue that defendant made any intentional misrepresentations to them. *See* Trscrpt. 8:21–25. Obviously, the analysis would be different were such a claim asserted here. *See, e.g. Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (holding that knowingly deceiving participants and beneficiaries regarding plan benefits was a breach of fiduciary duty); *Wayne v. Pac. Bell*, 238 F.3d 1048, 1055–56 (9th Cir. 2001) (noting that "[t]he fiduciary duty not to deceive plan participants and beneficiaries exists at all times, not merely once serious consideration of offering such benefits has begun.").

7. Since the Third Circuit's decision in *Fischer II*, it has been adopted by a number of other circuits. *See Vartanian v. Monsanto Co.*, 131 F.3d 264, 269 (1st Cir.1997) (finding that "[t]he Third Circuit . . . carefully reconciled [the] competing concerns [of employers wearing 'two hats'] in shaping the *Fischer II* test"); *Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042, 1049 (9th Cir.2000) (adopting *Fischer II* as "the proper tool for ensuring that an ERISA employer-fiduciary discharges its 'duties with respect to a plan solely in the interest of the participants and beneficiaries.'"); *Hockett v. Sun Co., Inc.*, 109 F.3d 1515, 1522 (10th Cir.1997); *but see Muse v. IBM Corpo.*, 103 F.3d 490, 494 (6th Cir.1996) (adopting "serious consideration" as the trigger but without reference to *Fischer II*); *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122–24 (2d Cir. 1997) (holding that "serious consideration" is

that the trustees of a multiemployer pension fund have that same fiduciary duty of disclosure upon "serious consideration."

As the Third Circuit noted, "[t]he concept of 'serious consideration' recognizes and moderates the tension between an employee's right to information and an employer's need to operate on a day-to-day basis." *Id.* at 1539; *see also* 120 Cong. Rec. 29,945 (1974) (statement of Senator Long) ("We know that new pension plans will not be adopted and that existing plans will not be expanded and liberalized if the costs are made overly burdensome, particularly for employers who generally foot most of the bill.").

■■■ The "serious consideration" test, therefore, serves employers' interests by limiting their obligations to disclose and giving them the freedom to consider possible amendments to their plans. *Hockett v. Sun Co., Inc.,* 109 F.3d 1515, 1523 (10th Cir.1997). A rule requiring earlier disclosure would risk being overly burdensome and could easily become counter-productive by discouraging employers from considering such proposals in the first place. *Bins,* 220 F.3d at 1049.

The "serious consideration" test also protects participants and beneficiaries by ensuring that they are not deluged with information, while also guaranteeing that they receive the notification they really need in order to properly evaluate their own options with respect to retirement. *Fischer II,* 96 F.3d at 1539; *see also Hockett,* 109 F.3d at 1523.

As noted above, the trustees of a multiemployer pension fund have the same need to be able to freely consider changes to the pension plan. Therefore, the Court finds that the policy reasons undergirding *Fisher II* are equally applicable in this case.

a factor relevant to the materiality inquiry but

## A. The "Serious Consideration" Standard

■■■ "Serious consideration" of a change in ERISA plan benefits sufficient to create a fiduciary duty compelling disclosure to employees who inquire occurs when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement that change. *Fischer II,* 96 F.3d at 1539. The formulation is fact-specific, and turns on the interaction of all three factors. *Id.* And, it has been repeatedly held that all three factors must "coalesce" in order for "serious consideration" to be found. *Rodowicz v. Massachusetts Mutual Life Ins. Co.,* 192 F.3d 162, 173 (1st Cir.1999); *see also Vartanian,* 131 F.3d at 272 (looking for a "composite picture of serious consideration") (quotations and citations omitted); *Bins,* 220 F.3d at 1049 (same).

The first factor, that a specific proposal exist, is designed to distinguish serious consideration from the requisite antecedent steps of gathering information, developing strategies and analyzing options. *Fischer II,* 96 F.3d at 1539–40. A proposal may contain alternatives and still be considered specific. Moreover, it may differ from the plan that is eventually implemented and still be considered specific. It must, however, be "sufficiently concrete to support consideration by senior management for the purpose of implementation." *Id.* at 1540; *see also Bins,* 220 F.3d at 1050–51. In order for a proposal to be sufficiently concrete, one Circuit Court has required a fresh cost analysis. *Hockett v. Sun Co., Inc.,* 109 F.3d 1515, 1525 (10th Cir.1997) (noting that "it is unlikely that a specific proposal would be 'sufficiently concrete' without [cost analysis or actuarial work]").

not a "prerequisite").

The second factor, that the specific proposal be discussed for purposes of implementation, similarly distinguishes serious consideration from the preceding data gathering and strategic planning that, while necessary to the formulation of plan changes, do not generate a fiduciary duty. *Fischer II*, 96 F.3d at 1540. This factor, coupled with the first, protect the ability of senior management to take an early role in the process of developing changes, without triggering a duty of disclosure. *Id.* Therefore, a "corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits." *Id.* "Consideration becomes serious when the subject turns to the practicalities of implementation." *Id.*

The third factor, that a specific proposal be discussed by senior management with the authority to implement it, is designed to ensure that a court's analysis of serious consideration focuses on the proper actors within the corporate hierarchy. *Id.* Until senior managers with the authority to implement the changes address the issue, any specific plan changes have yet to be "seriously considered." *Id.*

■■■ Only when those three factors coalesce does the trustee have a fiduciary duty to respond to participants' questions "accurately and straightforwardly." *Bins v. Exxon Co., U.S.A.*, 220 F.3d 1042, 1048 (9th Cir.2000).

**B. Applying *Fischer II***

■■■ Defendant contends that "serious consideration" did not occur until January 20, 1998, while plaintiffs point to December 9, 1997 as the trigger date. The Court agrees with defendant that the three *Fischer II* factors coalesced as of January 20, 1998 for the following reasons. Before explaining its rationale, the Court reiterates the oft-stated caution that *Fischer II* is a fact-specific inquiry and that the Court's holding here should not be construed as any bright-line rule regarding when serious consideration is triggered. *Kurz*, 96 F.3d at 1549–50; *Bins*, 220 F.3d at 1049–50.

At the outset, the Court notes that the third factor—discussion of the proposal by senior management—is satisfied as of plaintiffs' date, December 9, 1997. There can be no denying that the Trustees here had the authority to implement proposed changes to the pension plan given that, ultimately, they were responsible for the implementation of the change at issue here. As of both December 9, 1997 and January 20, 1998, the Trustees were discussing the possibility of amending the plan via an increase in years of creditable service. However, the Court finds that there was neither a specific proposal, nor discussions of implementation, as those are defined in *Fischer II*, prior to January 20, 1998.

■■■ A specific proposal must be the culmination of efforts to "gather[ ] information, develop[ ] strategies, and analyz[e] options." Here, there was no specific proposal before January 20, 1998 for a number of reasons. First, before that date, an increase in the years of creditable service was nothing more than one possible means of stemming the growing number of retirements. *See Kurz*, 96 F.3d at 1549 (finding that no specific proposal existed before results of pension benefit study were presented to senior management); *Muse*, 103 F.3d at 494 (noting that undertaking studies "to gain a general appreciation" of the possible ways of amending the plan does not trigger fiduciary duty of disclosure regarding those possibilities).

Second, until January 20, 1998, the proposal was not specific because it was not supported by any actuarial analysis. *See*

*Hockett,* 109 F.3d at 1525. It was not until the January 20, 1998 meeting that the Trustees learned that the Fund had sufficient finances to support an increase in years of creditable service to thirty-five.

And, finally, the Court rejects plaintiffs' position because before January 20, 1998, the change in years of creditable service was not discussed in any detail. *See Vartanian,* 131 F.3d at 272 (finding no specific proposal because "[a]t most, there was a suggestion than an enhanced severance package might be one way to deal with the company's fiscal woes"); *Bins,* 220 F.3d at 1050 (finding that proposals were not specific because they lacked sufficient detail to permit management to discuss them for the purpose of implementation). There is no indication from the testimony of those present at that meeting that there was any discussion of specifics regarding this proposed amendment to the Plan. *See* Tramontana Aff. ¶ 18 ("There was no discussion as to how or when to implement any ... change because it was not yet accepted [as of the December 9, 1997 meeting]."); Daniher Aff. ¶ 16 ("At no time [during the December 9, 1997 meeting] did the Trustees how, when, or what had to be done to implement that proposal."). The minutes of the December 9, 1997 meeting moreover reflect only the conditional approval of the Trustees of the entire restated plan prepared by Hart. Exh. E to Dft.'s Brief.

Moreover, the proposed change in years of creditable service was not discussed for implementation purposes, as required by *Fischer II,* until the January 20, 1998 meeting. *See, e.g., Vartanian,* 131 F.3d at 272 (finding no serious consideration even where senior management was discussing enhanced severance package because "there [was] no evidence that anything of substance was ... discussed for implementation. The ideas that were floating among top management were only that—

ideas"); *Chichelo,* 2001 WL 294008, at *6 ("[L]iability does not necessarily attach at the earliest example of affirmative action taken by management to implement a plan ... [G]eneral discussions of early retirement options by senior management, and the development of a specific plan on the instructions of senior management for their future approval, fail to rise to the level of serious consideration.").

As discussed above, it was not until the January 20, 1998 meeting that the Trustees discussed core issues of implementation, namely how to obtain IRS approval, how to give notice to beneficiaries and when to give that notice. Therefore, this Court finds that there was neither a specific proposal, nor discussions for purposes of implementation prior to January 20, 1998. Therefore, the three *Fischer II* factors did not coalesce before January 20, 1998.

Based on this analysis, any plaintiff who inquired about changes in pension benefits after serious consideration began on January 20, 1998, and was not informed of the impending increase in years of creditable service, received material misinformation and defendant breached its fiduciary duty owed to that plaintiff. Plaintiffs' own testimony, cited above, indicates that not one of them inquired about possible changes in their benefits after January 20, 1998, therefore summary judgment in favor of defendant is appropriate.

## CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment will be granted. Plaintiffs' complaint will be dismissed with prejudice. An appropriate order is attached.

## ORDER

In accordance with the Court's Opinion filed herewith,

It is on this 28th day of June, 2001

ORDERED that defendant's motion for summary judgment is granted and plaintiffs' complaint is dismissed.