

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-12-2002

# Mushalla v. Teamsters Local 863

Precedential or Non-Precedential: Precedential

Docket No. 01-2879

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

## Recommended Citation

"Mushalla v. Teamsters Local 863" (2002). *2002 Decisions.* Paper 488.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/488

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 12, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2879

RUSSELL MUSHALLA; *STELLA SZWAST, individually and
in her capacity as the Executrix of the Estate of Edward
Szwast; PAUL FRITZINGER; LUIS GARCIA; CHARLES
FRITZ; FRANCISCO CORRAL; WALTER BORIS, JR.,
        Appellants

v.

TEAMSTERS LOCAL NO. 863 PENSION FUND

*(Amended -- See Clerk's Order dated 1/3/02)

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 99-cv-03260)
District Judge: Hon. Alfred M. Wolin

Argued: April 1, 2002

Before: SLOVITER, FUENTES and MICHEL,*
Circuit Judges

(Filed August 12, 2002)

_____

* Hon. Paul R. Michel, United States Court of Appeals for the Federal
Circuit, sitting by designation.


        Stephen E. Klausner (Argued)
        Klausner & Hunter
        Somerville, NJ 08876

         Attorney for Appellant

        Vincent J. Nolan, III (Argued)
        Kenneth I. Nowak
        Zazzali, Fagella, Nowak, Kleinbaum
         & Friedman
        Newark, NJ 07102

         Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

The appellants (hereafter "Employees"), members of the
Teamsters Union, filed suit against Teamsters Local No.
863 Pension Fund, under the Employee Retirement Income

Security Act (ERISA) of 1974, Pub. L. No. 93-406, 88 Stat. 829, 29 U.S.C. S 1001 et seq. (2002), claiming the Pension Fund violated its fiduciary duty to them by failing to disclose a proposed change in benefits prior to their retirement. After determining that the Pension Fund was not "seriously considering" the change in plan benefits when the Employees inquired about that possibility, the District Court entered summary judgment for the Pension Fund. Mushalla v. Teamsters Local No. 863 Pension Fund, 152 F. Supp. 2d 613, 630-31 (D.N.J. 2001).

In this appeal, the Employees argue that the District Court erred as a matter of law in its application and interpretation of the "serious consideration" test we enunciated in Fischer v. Philadelphia Electric Co., 96 F.3d 1533 (3d Cir. 1996) (Fischer II), and that genuine issues of material fact are still in dispute. In addition, the Employees assert that because the Pension Fund was a multiemployer fund, it had a greater duty to disclose proposed changes than a fund administered by a single employer.

I.

BACKGROUND

Appellants Russell Mushalla, Edward Szwast,1 Paul Fritzinger, Luis Garcia, Charles Fritz, Francisco Corral and Walter Boris, Jr. (collectively, the Employees) retired voluntarily from Wakefern Food Corporation, the merchandising and distribution arm of ShopRite, between December 19, 1997 and January 30, 1998. Each had been employed at Wakefern for over thirty years. All of the Employees participated in the Teamsters Local No. 863 Pension Fund (the Fund), a multiemployer fund administered jointly by the Teamsters Local No. 863 Union (the Union) and management representatives from Wakefern and other participating employers. The Fund is managed by five trustees appointed by the Union and five trustees selected by participating employers. Individual employers contribute to the Fund at rates governed by collective bargaining agreements with the Union.

The Fund does not apportion benefits based on the individual amount contributed by any individual employee. Instead, the Fund distributes monthly retirement benefits by a formula based on the number of years the employee worked for a participating employer (years of service) multiplied by the rate of contribution. At the time the Employees retired, the Fund capped the years of service used in calculating pension benefits at thirty years. In other words, employees received no credit for any year of service above thirty years in the calculation of their pension benefits. Following the Employees' retirement, the Fund announced that effective April 1, 1998 retirement benefits would be calculated based on years of service up to thirty-five years. All of the Employees are currently receiving benefits with their years of service capped at thirty.

1. Edward Szwast died on October 28, 2001. His widow, Stella Szwast, who receives an actuarially reduced pension, is a surviving beneficiary, and was substituted as a party in this proceeding individually and as executrix of her husband's estate, pursuant to Fed. R. App. P. 43(a)(1), by order of the clerk of this court on January 3, 2002.

The Fund began revising its benefit scheme in April 1997, when it retained Thomas J. Hart, a legal consultant, to redraft the terms of the Fund Plan (the Plan) to take into account changes made to the Internal Revenue Code and other laws. After reviewing the Plan and interviewing Fund representatives, Hart began drafting a restated Plan, which he worked on through October and November 1997. He did not discuss changing or revising the thirty-year cap on years of service with anyone related to the Fund during that time.

The Union business agent, Joseph Tramontana, who also served as a Trustee of the Fund, first raised the idea of increasing the cap on years of service. Tramontana, who was concerned that the Union was losing too many of its senior members, concluded that one way to retain senior members would be to increase their pension benefits to reflect years of service beyond thirty years. In early November 1997, Tramontana asked the Fund actuary, Stanley Weisleder, to perform a preliminary check into whether the Fund could afford to increase the maximum cap on years of service. Tramontana did not propose a specific number of years, and he did not discuss his idea with anyone else at that time. On November 10, 1997, Weisleder performed an analysis of the potential impact on the Fund if the cap on years of service were increased to forty-two years.

At the end of November, Weisleder advised Tramontana and the Plan consultant, Anthony Miranda, that the Fund could not afford to increase the maximum cap to forty-two years. Weisleder suggested that the Fund could probably afford a smaller increase in the cap to approximately thirty-five years, although he noted that he would need to perform an actuarial analysis for such an increase.

On December 4, 1997, Hart completed a draft of the restated Plan, which he distributed to the Plan's advisors. That draft contained no increase to the cap on years of service. After Tramontana reviewed the December 4 draft, he spoke to Miranda, Hart, and the Fund attorney, Andrew Zazzali, about increasing the cap on years of service to thirty-five years. They told him that any increase in the cap would have to be approved by the Fund actuary and the

Trustees. Tramontana responded "that [he] would like to

see [the cap increase] added to the proposed revised Plan so that we could at least get the ball rolling on having it reviewed." App. at 320.

The Union held a general membership meeting on December 7. Mushalla was the only appellant to attend. At the meeting, Tramontana reported that the Fund was considering an increase in the cap on years of service. Tramontana also advised the membership that a possible buyout of about 200 Pathmark employees was under consideration. Mushalla left the meeting with the misunderstanding that the change in the cap on years of service was applicable only to Pathmark employees.

On December 8, Miranda and Weisleder asked Hart to increase the cap in the restated Plan to thirty-five years. Hart did so, and reviewed the various changes in the restated Plan with the Trustees at their scheduled meeting the next day, December 9. Hart informed the Trustees that no cost study or actuarial analysis had been performed of the proposed increase to the cap. The Trustees responded by directing Weisleder and Zazzali to review the proposed increase in the cap to determine whether the change was feasible. Weisleder was instructed to report his cost-study findings to the Trustees before their next scheduled meeting on January 20, 1998. The minutes reflect that the Trustees approved the restated Plan "contingent upon the reviews of the Fund professionals and Trustees." App. at 283.

Meanwhile, Mushalla asked Daniel Mariano, a union business agent and Fund Trustee, on a few occasions whether any increases in Fund benefits were being considered. On each occasion, the last one being December 20, 1997, Mariano told Mushalla that no increases were under consideration. Szwast, Fritzinger, Garcia and Boris all questioned either Mushalla2 or Mariano sometime in 1997 about a possible pension increase. All were told that no pension increases were under consideration. Fritz relied

---

2. Because the Union is organized vertically, union members frequently approached Mushalla, who is a shop steward, with grievances and questions. Mushalla would take up issues with Mariano, who in turn would report to his supervisor, Tramontana.

5

on Fritzinger, his brother-in-law, for the same information. Corral never questioned anyone with the Fund or the Union about pension benefits before he retired.3

In January 1998, Weisleder performed the actuarial analysis and informed Miranda and Tramontana that it was financially feasible for the Fund to increase the cap to thirty-five years. At their scheduled January 20 meeting, Weisleder informed the Trustees of his finding. After accepting Weisleder's actuarial analysis, the Trustees began to discuss how to obtain IRS approval for the change, what type of notice would be necessary, and when notice had to

be given to participants about the proposed change. Hart advised them that the Fund was required to provide at least sixty days notice of any proposed change in pension benefits. App. at 342. The Trustees voted unanimously to approve the increase in the maximum cap on years of service to thirty-five years effective April 1, 1998. On February 1, 1998, the Plan administrator sent a letter to all Plan participants informing them of the increase in the cap on years of service and the effective date of April 1, 1998.

On July 8, 1999, the Employees filed suit in the United States District Court for the District of New Jersey claiming that the Fund had violated its fiduciary duty under ERISA. On May 7, 2001, the Fund moved for summary judgment. Following oral argument, the District Court concluded that the Fund did not violate its fiduciary duty to the Employees by failing to inform them of the proposed change to the pension benefits. The District Court also determined the Fund had no duty to communicate the proposed cap increase in response to the Employees' inquiries prior to January 20, 1998, when the Fund first "seriously considered" the increase in the cap. On that basis, the District Court granted the Fund's motion for summary judgment and dismissed the Employees' complaint. This appeal timely followed.

_____

3. The parties have not briefed the effect of Corral's failure to make any inquiry regarding prospective changes in the pension but resolution of that issue is unnecessary to our decision here.

II.

JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 29 U.S.C. S 1132(e)-(f), and this court enjoys jurisdiction under 28 U.S.C. S 1291. The parties agree that this court exercises plenary review over the District Court's grant of summary judgment and that we should "affirm summary judgment 'if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.' " Walling v. Brady, 125 F.3d 114, 116 (3d Cir. 1997) (quoting Smith v. Hartford Ins. Group, 6 F.3d 131, 135 (3d Cir. 1993)); see also Fed. R. Civ. P. 56(c).4 We review the facts in the light most favorable to the Employees, the party against whom judgment was entered. Beers-Capital v. Whetzel , 256 F.3d 120, 130 n.6 (3d Cir. 2001).

III.

DISCUSSION

A.

Multiemployer Plans

1.

In enacting ERISA, Congress sought "to protect . . . the interests of participants in employee benefit plans and their

_____

4. This court has previously reserved the question of the appropriate standard of review of a district court's determination of "serious consideration." See Kurz v. Phila. Elec. Co. , 96 F.3d 1544, 1549 n.4 (3d Cir. 1996); Fischer II, 96 F.3d at 1541 n.3. In Fischer I, we noted that the standard for materiality "is a 'mixed question of law and fact.' " Fischer v. Phila. Elec. Co., 994 F.2d 130, 135 (3d Cir. 1993) (Fischer I). However, as we noted in Fischer II, our discussion in Fischer I "linked serious consideration to materiality, indicating that it would be a question of law, subject to plenary review." Fischer II , 96 F.3d at 1541 n.3. Because the procedural posture requires us to decide this case as a matter of law, we do not reach the question of the appropriate standard of review.

beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. S 1001(b). In this appeal, the Employees contend that the Fund violated its fiduciary duty to them by failing to advise them of the proposed increase in the cap on years of service in response to their inquiries. A plan administrator breaches its fiduciary duty under ERISA if it materially misleads employees who inquire regarding possible changes in a plan. Fischer v. Phila. Elec. Co., 96 F.3d 1533, 1538 (3d Cir. 1996) (Fischer II). A plan administrator makes a material misrepresentation when it responds to employee inquiries by representing it is not considering a change to its pension plan, if it is in fact giving "serious consideration" to a change. Id.

The Employees argue that even if the Fund was not "seriously considering" a change to the Plan at the time they made their inquiries, the Fund was obligated to inform them of the proposed change. The Employees assert that because the Fund is a jointly-managed, multiemployer plan, the "serious consideration" test this court enunciated in Fischer II does not apply to it. Essentially, the Employees invite this court to create a new line of authority, paralleling Fischer II but setting a lower standard than the "serious consideration" test to take into account the differences between multiemployer and single employer plan administration.

The Employees maintain that this court created the "serious consideration" test in Fischer II to "strike a balance between an employee's right to information and an employer's need to operate a business." Br. of Appellants at 17. Although the Employees accept that Fischer II is good law, they assert that the "underlying tension[noted in Fischer II] . . . is simply inapposite" to a multiemployer plan, because "[t]he corporate profit motive simply does not exist herein." Id. Thus, the Employees contend the Fischer

II "serious consideration" test should not apply to multiemployer pension plans because for multiemployer pension plans "there is no need to strike a balance between an employee's right to information and an employer's need

to operate a business, given that companies must develop strategies and evaluate options as they prepare for decisions." Id.

The District Court rejected the Employees' argument that Fischer II should apply differently to multiemployer plans than to single employer plans. The District Court concluded that this court's decision in Walling v. Brady , 125 F.3d 114 (3d Cir. 1997), controlled. Mushalla, 152 F. Supp. 2d at 625. The District Court stated that the trial court in Walling had "based its decision largely on the same distinction between multi- and single-employer plans that plaintiffs ask this Court to make here. The Court of Appeals reversed, finding no 'material difference in the administration of single- and multi-employer plans.' " Id. (alteration in original) (quoting Walling, 125 F.3d at 118).

Unlike this case, where the duties of plan administrators in communicating changes in benefits to plan participants are at issue, Walling considered the fiduciary duty of plan administrators toward plan participants when the administrator amends the plan. In other words, Walling concerned the duties of administrators in making changes to a plan, while this case concerns the duties of the administrator to communicate that change to employees.

Nonetheless, the conclusion in Walling that absent some material difference in administration there is no distinction between single employer and multiemployer plans is directly pertinent. Congress clearly contemplated that an employer could choose between administering its own pension plan and conjoining its efforts with other employers. See, e.g., 29 U.S.C. S 1002(16)(B) (using the term "plan sponsor" rather than "employer," and thereby encompassing "a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations"); 29 U.S.C. S 1060(a)(1) (directing that other ERISA sections "be applied as if all employees of each of the employers were employed by a single employer"). As we held in Walling , where there is no material difference between the way a multiemployer plan and a single employer plan are administered,"the simple fact that the plan at issue is a multiemployer plan

is insufficient" to alter the fiduciary duties of the administrator. Walling, 125 F.3d at 118.

Even if Walling did not persuade us to reject the proffered distinction between the fiduciary duties of administrators of

multiemployer and single employer plans for this purpose, our decision in Fischer II compels the application of the "serious consideration" test to multiemployer funds. The District Court determined that "the trustees of a multiemployer pension fund have the same need to be able to freely consider changes to the pension plan [as individual employers]." Mushalla, 152 F. Supp. 2d at 628. The court noted that "[t]he 'serious consideration' test . . . protects . . . beneficiaries by ensuring that they are not deluged with information," while a contrary rule "requiring earlier disclosure[,] could . . . discourag[e] employers from considering . . . proposals [to amend plans]." Id. The District Court concluded, "the policy reasons undergirding Fis[c]her II are equally applicable in this case." Id.

We agree with the District Court. Although Fischer II came to us in the posture of an early retirement plan offered by a single employer, the policies we noted in that case apply with equal force to a jointly-administered, multiemployer fund. Most importantly, we noted in Fischer II that " 'ERISA does not impose a duty of clairvoyance on fiduciaries. An ERISA fiduciary is under no obligation to offer precise predictions about future changes to its plan. Rather, its obligation is to answer participants' questions forthrightly, a duty that does not require the fiduciary to disclose its internal deliberations.' " 96 F.3d at 1539 (citations and quotations omitted in original) (quoting Fischer v. Phila. Elec. Co., 994 F.2d 130, 135 (3d Cir. 1993) (Fischer I)). This is in keeping with "[o]ther courts of appeals[, which] have likewise emphasized the absence of any 'duty of clairvoyance,' as well as the fact that disclosure does not extend to internal deliberations." Id. (citing Swinney v. Gen. Motors Corp., 46 F.3d 512, 520 (6th Cir. 1995); Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994); Drennan v. Gen. Motors Corp., 977 F.2d 246, 251 (6th Cir. 1992); Barnes v. Lacy, 927 F.2d 539, 544 (11th Cir. 1991); Berlin v. Mich. Bell Tel. Co., 858 F.2d 1154, 1164 (6th Cir. 1988)).

10

We also observed in Fischer II that although employees benefit from having pertinent information in making their employment decisions, requiring disclosure of every potential plan change

> could result in an avalanche of notices and disclosures. For employees at a company . . . which regularly reviews its benefits plans, truly material information could easily be missed if the flow of information was too great. The warning that a change in benefits was under serious consideration would become meaningless if cried too often.

Id. The Employees have failed to so much as speculate how employees who participate in jointly-administered plans would be more adept at negotiating "an avalanche of notices and disclosures" than employees who work for companies that manage their own pension plans

individually.

Further, we recognized in Fischer II that"[e]very business must develop strategies, gather information, evaluate options, and make decisions. Full disclosure of each step in this process is a practical impossibility." 96 F.3d at 1539. The administrators of a jointly-managed, multiemployer plan are in no better position than an individual employer in overcoming the practical difficulties referred to in Fischer II. We know of no authority that suggests that plan administrators, whether of a single employer plan or a multiemployer plan, must inform plan participants of the content of every brainstorming session.

Even assuming the Employees are correct that the "corporate profit motive" does not influence multiemployer plan decisions as it may single employer plan decisions, the administrators of multiemployer plans have no greater duty of clairvoyance than any other ERISA fiduciary. Persuaded by Walling and constrained by Fischer II , we hold that Fischer II's "serious consideration" test applies with the same force to multiemployer plans as it does to single employer plans.

2.

We dispense quickly with the Employees' suggestion that the Fund had an affirmative duty to communicate the

11

potential amendment of the Plan to them regardless of whether they made inquiries. The District Court rejected this contention by noting that Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292 (3d Cir. 1993), and the other cases on which the Employees relied in discerning an affirmative duty to disclose plan benefits concern existing plan benefits, not proposed plan benefits. See, e.g., Bixler, 12 F.3d at 1300; see also Joyce v. RJR Nabisco Holdings Corp., 126 F.3d 166, 174 (3d Cir. 1997); Jordan v. Fed. Express Corp., 116 F.3d 1005, 1014 (3d Cir. 1997). We agree.

Cases in the Bixler line place an affirmative duty on fund administrators to provide fund participants with relevant information regarding existing benefits. The Fischer II line, by contrast, places a duty on fund administrators to respond truthfully to the inquiries of fund participants regarding potential changes to their benefits which are under "serious consideration." While the two lines of cases are consistent, they do not overlap. Bixler applies to existing benefits, Fischer II applies to possible benefits. Because the increase in the cap of the Pension Fund did not become effective until April, 1998, long after the last of the Employees retired, Bixler is not implicated here.

B.

Serious Consideration

The Employees argue that even if the "serious consideration" test applies, disputed issues of material fact remain as to whether the Fund seriously considered raising the cap on years of service at the Trustees meeting on December 9, 1997. In support of their argument, the Employees note that the Trustees voted unanimously to adopt the proposal on December 9, 1997. Although the Employees acknowledge that the Trustees approved the plan conditional on Weisleder's actuarial analysis, the Employees maintain that cost-analysis or actuarial work is not a necessary prerequisite to "serious consideration."

The District Court concluded that the Fund did not seriously consider raising the cap on years of service until

the January 20, 1998 meeting. Mushalla, 152 F. Supp. 2d at 630. An ERISA fiduciary gives "serious consideration" to changing its plan when "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." Fischer II, 96 F.3d at 1539. These three factors are not isolated, but instead "the three interact and coalesce to form a composite picture of serious consideration." Id. We dispense quickly with the third factor, consideration by officers with the authority to implement the change, which the Fund concedes was met for the December 9 meeting.

As to the first factor, a specific proposal follows the preliminary steps of "gathering information, developing strategies, and analyzing options." Id. at 1539-40. It must be "sufficiently concrete to support consideration by senior management for the purpose of implementation." Id. at 1540. The District Court noted that there was no specific proposal prior to January 20, 1998 because "the proposal was . . . not supported by any actuarial analysis" and "the change in years of creditable service was not discussed in any detail." Mushalla, 152 F. Supp. 2d at 629-30.

The Employees point to a phrase from the Tenth Circuit's decision in Hockett v. Sun Co., 109 F.3d 1515 (10th Cir. 1997), to suggest that "cost-analysis or actuarial work is not a necessary prerequisite to serious consideration." Id. at 1525. Taken in context, Hockett is not of much help to the position of the Employees. As the Hockett court observed, "[w]hile cost-analysis or actuarial work is not a necessary prerequisite to serious consideration, it is unlikely that a specific proposal would be 'sufficiently concrete' without some such information." Id. (emphasis added) (citing Fischer II, 96 F.3d at 1542). We agree with the Tenth Circuit and the Employees that cost-analysis and actuarial work are not always necessary prerequisites to serious consideration. However, we also agree that "it is unlikely that a specific proposal would be 'sufficiently concrete' without some such information," id. , particularly when, as here, the decision was based on the proposal's financial viability.

When the Trustees conditionally approved the increase to the cap on years of service, Weisleder had not yet

13

performed a study confirming that the Fund could afford it. Thus, information crucial to the proposal's viability was still to be gathered. As we noted in Fischer II,"[s]erious consideration can only begin after information is gathered and options developed." Fischer II, 96 F.3d at 1542. Without an investigation into what was arguably the single most important factor in the Trustees' decision, the financial viability of the increase, there could be no specific proposal, no matter how precisely the proposal was drafted.

The absence of "serious consideration" is definitively established by the second factor of the test. In Fischer II, we explained that the discussion for implementation element "distinguishes serious consideration from the preliminary steps of gathering data and formulating strategy." We continued, "It also protects the ability of senior management to take a role in the early phases of the process without automatically triggering a duty of disclosure." Id. at 1540. As we noted,"[c]onsideration becomes serious when the subject turns to the practicalities of implementation." Id. There is no suggestion that the Trustees discussed the proposal for the purposes of implementation at the December 9 meeting. The Trustees did not discuss implementing the cap increase until they were assured by Weisleder on January 20 that it was a financially viable option. It was not until then that the Trustees addressed obtaining IRS approval, the type of notice needed, and the date of notice of the forthcoming change.

The Trustees could not seriously consider the amendment to the Plan until they had at least investigated whether it was financially viable and examined some of the practical restraints on its implementation. We are aware of the disappointment and frustration of the Employees to have learned only months after they retired that their pensions would have been larger had they postponed their retirement for a short period. However, in light of the lack of a specific proposal and the absence of any discussion among the Trustees about implementation, two of the three Fischer II factors that must interact "to form a composite picture of serious consideration," Fischer II , 96 F.3d at 1539, we agree with the District Court that the evidence

14

raises no disputed issue of material fact as to the absence of serious consideration by the Trustees of a proposed cap increase prior to January 20, 1998.

IV.

CONCLUSION

For the reasons set forth, we will affirm the decision of
the District Court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

15