

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-4-2005

# Peterson v. AT&T

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-2213

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Peterson v. AT&T" (2005). *2005 Decisions.* Paper 1398.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1398

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-2213

———

GERALD H. PETERSON; ROBERT A. BRIDGMAN;
FRANK MANGONE; DAVID A. PORTZER;
MICHAEL SLOANE; ROBERT J. LAFLAMME;
EUGENE RAPPOPORT; ROBERT C. ALBERS;
BARBARA ATKINS; WILLIAM H. CARTER;
SONYA COMSTOCK; JOSEPH G. COUPLAND;
WILLIAM J. DANNICH; FRANCIS L. GRIFFITH;
NEIL HABIG; GEORGE R. KELLY;
DAVE KERSHAW; WILLIAM P. KUEHNER, JR.;
SALVATORE M. LANDO; ROBERT C. MASCOLA;
GLENN C. MILLER, JR.; ANDREW J. NAVALANCE;
WALTER E. PRICE; ANTHONY J. SCHIANO;
GARY J. STOUT; ROBERT A. WELLER;
RUSSELL D. WILLIAMS; ROBERT B. ZORNETZER;
MICHAEL D'ALBERO; GEORGE C. WUZNIAK;
PETE BARLETTO; REX O. BARROW;
O. L. DRINKWATER; RONALD J. SEARS;
RODNEY STOLL; RICHARD S. RIGGS

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY

Gerald H. Peterson; Frank Mangone;
David A. Portzer; Robert J. Laflamme;
Eugene Rappoport; Salvatore M. Lando;
Robert C. Mascola; Anthony Schiano;
George C. Wuzniak; Ronald J. Sears,

Appellants

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 99-cv-04982)
District Judge: Honorable Jose L. Linares

Argued March 8, 2005
Before: NYGAARD, McKEE, and RENDELL, Circuit Judges.

(Filed: April 4, 2005)

Brian J. McMahon, Esq. (Argued)
Richard S. Zackin, Esq.
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
One Riverfront Plaza
Newark, NJ 07102-5497
        Counsel for Appellants

Joseph R. Guerra, Esq. (Argued)
Sidley, Austin, Brown, & Wood
1501 K Street, NW
Washington, DC 20005

Christopher H. Mills, Esq.
Collier, Jacob & Mills
580 Howard Avenue
Corporate Park III
Somerset, NJ 08873
        Counsel for Appellee

OPINION OF THE COURT

NYGAARD, <u>Circuit Judge</u>.

We are asked here to review Appellee American Telephone and Telegraph Company, AT&T's, decision to use its retirement plan in an effort to reduce the size of its workforce. The Appellants, a retired group of middle managers for AT&T, claim that AT&T breached its fiduciary duties under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq*. The District Court granted summary judgement in favor of AT&T. We now affirm.

**I.**

*A. Special Update and the change in pension plans*

In 1997, AT&T made the decision to change the method by which it calculated pension benefits for its management employees. Before that time, AT&T used a traditional or "defined benefit" approach. Under this approach, AT&T used a formula that incorporated four factors: (1) the participant's average compensation during the "base pay averaging period" (prior to 1997, that period was 1987-1992); (2) the participant's annual compensation for each year after the base pay averaging period; (3) the participant's length of service; and (4) a specified percentage multiplier. At a certain point during an employee's service at AT&T (around 25 years) employees would reach a "cliff" where their years of service would cause pension benefits to increase dramatically. Under this traditional plan, the pensions were not very portable, and unlike other types of plans it was difficult for an employee to know what their pension was worth at any given

3

time. The plan was also costly to administer and encouraged early retirements.

As a result of the disadvantages of the traditional plan, AT&T decided to switch to a cash balance plan. Under this plan, AT&T "credits" an employee's hypothetical pension account with a certain amount of "pay" and "interest" for each year of service. This plan is less costly to administer and virtually eliminates early retirement subsidies. By converting to this system, AT&T expected to decrease its annual pension accounting expenses by $40 million.

When AT&T decided to switch to a cash balance plan, it faced a problem with what to do with employees approaching the "cliff" within the next few years under the traditional plan. These employees were unlikely to work long enough to accumulate an amount in their cash balance account equal to what they would have received under the traditional plan. To solve this problem AT&T offered what it termed, "Special Update." Special Update enhanced the old formula by: (1) moving the base pay averaging period from 1987-1992 to 1994-1996; (2) increasing a participant's total years of service by 5% up to a maximum of one year; and (3) eliminating age and service requirements for taking early retirement. Special Update then "froze" the traditional pension plan. Thus, continued service for AT&T would have no impact on an employee's retirement under the traditional plan. Consequently, employees could retire at the same pension benefits in 1997 when Special Update was offered as they could for the next several years. AT&T gave employees the option of either (1) taking Special Update and having their benefits

4

under the traditional plan "frozen," or (2) switching to the cash balance option.

AT&T offered literature, call centers, web sites, and workshops regarding the switch from the traditional plan to the cash balance plan. AT&T told employees that, in most cases, if they were going to retire within the next 4–7 years, Special Update would provide better retirement benefits. If an employee planned on working for AT&T for longer than seven years, however, the cash balance plan would provide better benefits.

The Appellant-Retirees are all former AT&T employees who chose to accept Special Update for their retirement pensions. Furthermore, given that they planned to retire in the near future and that under Special Update, their benefits were "frozen," they also chose to retire from AT&T. They contend that luring employees, such as themselves, into early retirement was the goal of Special Update. They believe that AT&T was using the over funded Management Pension Plan to induce middle managers to retire in order to fulfill a long-standing AT&T goal of reducing the work force.[1] Some evidence in the record supports the view that at least one benefit of the switch in plans was "restructuring" of AT&T's workforce.[2]

---

[1] In fact, the Retirees contend that AT&T had been pursuing a three year plan to reduce the work force by 40,000 employees under CEO Robert Allen. The Retiree's general contention that AT&T wished to reduce its workforce is undisputed. Their broader claim, however, that this "master plan" to reduce the workforce proves that AT&T breached its duty in this case, was rejected by the District Court. As will be explained below, we reject this contention as well.

[2] The Retirees rely heavily on an article co-authored by Harold Burlingame (AT&T's Executive Vice President of Human Resources) and Michael Gulotta (President and CEO of AT&T subsidiary Actuarial Sciences Associates (ASA), which was the company that

5

*B. Downsizing and the Voluntary Retirement Incentive Program*

In November 1997 Michael Armstrong replaced Robert Allen as CEO of AT&T. Between the time Armstrong became CEO and March 18, 1998, AT&T developed, and the Board of Directors approved, a plan known as the Voluntary Retirement Incentive Program (VRIP). Beginning in early-to-mid November, Armstrong began to outline "broad strokes" to redefine AT&T's business and reduce costs. Accordingly, employees in human resources and actuarial services began to think of ways to reduce the workforce.

The specific type of plan ultimately used by AT&T began to take shape on January 7, 1998, when Burlingame introduced the idea of a voluntary workforce reduction to the Operations Group (OG). At that time, the OG rejected the idea of a voluntary retirement program because they were concerned that such a program risked losing too many members of senior management. Following that meeting, members of AT&T's Human Resources, Benefits and Legal Organizations, and ASA met and developed three downsizing options: (1) temporary enhancements to induce voluntary departures; (2) involuntary force reduction; and (3) a combined plan. After extensive discussions on the benefits and disadvantages of each option, on January 19, 1998, the OG agreed to recommend the VRIP concept to the Compensation and Employee Benefits Committee (CEBC)—the subcommittee of the Board of Directors responsible for reviewing and making recommendations to the Board for proposed amendments to the Plan. The CEBC

designed AT&T's new retirement program).

agreed to recommend the plan to the Board on January 20, 1998, and after some additional changes, the Board approved the final version of VRIP.

Once the changes to the retirement plan were announced, the Retirees filed this suit. Essentially, they claim that AT&T lured them into retiring by promising that Special Update was the last increase in the deferred benefit retirement plan and that it was the "best they were going to get." Then, they claim, when Special Update did not produce enough retirees, AT&T offered a new retirement incentive—VRIP. The Retirees allege that this was part of AT&T's "master plan" to eliminate approximately 40,000 workers at AT&T. They claim that AT&T knew all along that it would need to offer VRIP because Special Update was not producing enough retirements, and therefore AT&T breached its fiduciary duties by not informing the Retirees of the impending VRIP and by misleading them about Special Update.

**II.**

The District Court granted summary judgment in favor of AT&T. The Court found that there was no "credible evidence of any sort of decision or long-term 'master plan' to reduce the work force," and therefore limited the time frame to events occurring after Armstrong became CEO. Once the District Court limited the time period, it went on to outline three possible ways that AT&T violated its fiduciary duties: (1) by falsely representing that Special Update would provide the greatest benefits to retirees over the next four to seven years; (2) by falsely representing that Special Update benefits were

7

"frozen"; and (3) by falsely representing that anyone retiring pursuant to Special Update would be given an opportunity to participate under any enhanced plan. Only the first two are relevant on appeal.[3]

The District Court then proceeded to conduct two lines of analysis. First, it examined the case under *Fisher v. Philadelphia Electric Co.*, 994 F.2d 130 (3d Cir. 1993) (*Fisher I*) and *Fisher v. Philadelphia Electric Co.*, 96 F.3d 1533 (3d Cir. 1996) (*Fisher II*). The Court concluded that at the time the Retirees retired, VRIP was not yet in "serious consideration." Therefore, AT&T did not have an obligation to disclose any information about VRIP to the Retirees, and did not breach its fiduciary duties. As is explained below, we believe that *Fisher* provides the proper test in this case, and agree with the District Court's conclusion that VRIP was not under serious consideration at the time the Retirees retired from AT&T. Consequently, AT&T did not breach its fiduciary duties by failing to disclose VRIP.

Next, the District Court analyzed the case as set forth in *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir. 1993). Pursuant to this line of reasoning, the Court concluded that AT&T had not breached its duty because it provided accurate information as to existing benefits. To the extent that a

---

[3] The District Court did not grant summary judgment on the third issue to the two Plaintiffs who actually alleged they were told that they would be given the opportunity to participate in future changes. With respect to that issue, these two Plaintiffs have subsequently settled with AT&T.

8

*Bixler* analysis is appropriate in this case, we agree that AT&T provided accurate information regarding existing benefits to the Retirees.

### III.

On appeal, the Retirees claim that Special Update was part of a long term downsizing scheme. They claim that this fact is not only material, but critical. The District Court rejected Appellant's "master plan" argument finding that they had not presented any credible evidence that there was such a plan.

The question of whether Special Update was, at least in part, a downsizing measure, does not mandate reversal. Summary judgment is proper unless the facts in dispute are *material*. *See, e.g., Unisys Sav. Plan Litig. v. Unisys Corp.*, 74 F.3d 420, 433 (3d Cir. 1996) (*Unisys II*). Here, they are not. The ultimate question here is whether AT&T breached its fiduciary duties by failing to disclose possible future changes to the pension plan, not changes to the size of its workforce, and that question depends on whether VRIP was under "serious consideration." Even if we assume that there was a "master plan" to downsize, it does not affect our analysis of whether the specific VRIP plan was under serious consideration.

*A. AT&T did not have a duty to disclose VRIP when the Retirees retired.*

The first step in examining whether AT&T breached its fiduciary duties under ERISA is to distinguish between two lines of cases that have discussed the types of duty owed by a plan administrator. First, we have held that an administrator/employer has a

9

duty to "convey complete and accurate information material to the beneficiary's circumstance . . . . [E]ven if that information comprises elements about which the beneficiary has not specifically inquired." *Bixler*, 12 F.3d at 1300. *Bixler* applies to existing benefits. *Mushalla v. Teamsters Local No. 863 Pension Fund*, 300 F.3d 391, 398 (3d Cir. 2002). Second, a plan administrator may not "make material misrepresentations to plan participants about changes to an employee pension benefits plan." *Fisher I*, 994 F.2d at 135. *Fisher* applies to possible benefits or changes to benefits plans. *Mushalla*, 300 F.3d at 398.

The question of whether AT&T had a duty to disclose VRIP, a future change to the pension plan, falls under *Fisher*. In *Fisher I* we explained that "a misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire." *Fisher I*, 994 F.2d at 135. We also directed that included with the materiality determination is an "inquiry into the seriousness with which a particular change to an employee pension plan is being considered at the time the misrepresentation is made." *Id*. This question of seriousness came to be known as the "serious consideration" test and is the benchmark for ERISA breach of fiduciary duty cases under *Fisher*. *Fisher II*, 96 F.3d 1533.

In *Fisher II* we refined the "serious consideration" test. In order to be under "serious consideration" a change to an employee benefit plan must meet three requirements: (1) there must be a specific proposal; (2) it must be being discussed for the

10

purpose of implementation; and (3) it must be discussed by senior management who have the authority to implement the change. *Id*. at 1539. This test was created to balance the tension between the employee's right to information and the employer's need to operate on a day-to-day basis. *Id.* The test prevents employees from being inundated with constant notices of possible changes, while also ensuring that, at some point, they are informed of a pending change. It also protects the employer's right to engage in a regular review of benefit packages, and offer voluntary retirement instead of involuntary layoffs. Serious consideration marks the point on a continuum between the "most casual mention of a possible plan change" and ending with a formal vote of the board of directors instituting a new plan. *Hockett v. Sun Co.*, 109 F.3d 1515, 1522 (10th Cir. 1997).

The District Court concluded that the earliest AT&T began seriously considering VRIP was on January 14, 1998—after all the Retirees had retired. We agree with this determination. The Retirees contend that serious consideration began in 1996 when the Allen downsizing plan was put into effect, but such a broad downsizing objective is not sufficient to meet the serious consideration test.[4]

---

[4] The Retirees argue that the specific proposal was the 1996 Allen Plan to eliminate 17,000 management positions over three years. It should be noted, however, that they do not claim that AT&T kept them in the dark about the 1996 Allen Plan. Rather, they object to not being told about VRIP. Therefore, even if the 1996 Allen Plan was a "specific proposal" it was disclosed to the Retirees before they made their decision to retire. Furthermore, *Fisher* requires employers to disclose future changes to pension and benefit plans. Assuming benefit plans are not affected, *Fisher* does not require that employers reveal plans to alter the size of their workforce, even if those changes are under "serious consideration."

11

The first component of the serious consideration test is that there must be a specific proposal. This element is intended to distinguish between preliminary steps—such as gathering information, developing strategies, and analyzing options—and serious consideration of a plan. *Fisher II*, 96 F.3d at 1539. The plan does not have to be in its final form, but must be "sufficiently concrete to support consideration by senior management for the purpose of implementation." *Id.*; *see also Mushalla*, 300 F.3d at 399. Prior to the first week in January, all the work preformed on a voluntary workforce reduction plan was information gathering and development of strategy. The earliest date that the first prong of the serious consideration test could have been satisfied was January 7, 1998.

The second element is that the proposal must be discussed for the purpose of implementation. This element protects senior management's ability to take a role in the early, investigatory phases of the process without triggering a duty to disclose any information. *Fisher II*, 96 F.3d at 1540. Discussions, even with senior management, are only serious consideration when the "subject turns to the practicalities of implementation." *Id.* The District Court found that this element occurred on January 10 and 11, 1998 when members of AT&T's Human Resources, Benefits and Legal departments, and ASA met and developed three downsizing opinions including one that ultimately resembled VRIP. This was the first time that a team was considering the manner in which such a plan would be implemented.

12

The final element requires that a specific plan be discussed for the purpose of implementation with senior management who has the authority to implement the change. Here, that group of senior management is most likely the OG.[5] The first time a voluntary workforce reduction plan, such as VRIP, was seriously discussed with the OG was January 14, 1998. Thus, this is the earliest date that serious consideration could have taken place.

*B. Did AT&T make false statements regarding Special Update?*

The Retirees claim that AT&T breached its fiduciary duties with respect to statements made in 1997 regarding Special Update by (1) falsely representing that Special Update would provide the greatest benefits to retirees over the next four to seven years, and (2) falsely representing that Special Update benefits were "frozen."[6]

As noted by the District Court, it is difficult to discern whether the Retirees object under *Bixler* or *Fisher*. On one hand, if the Retirees are objecting that AT&T misled them about Special Update by failing to disclose that VRIP would be offered in early 1998, then the *Fisher* analysis would be appropriate. It appears that this is the Retiree's claim. They claim they were lead to believe that Special Update was the "best they were

---

[5] It is possible that the Compensation and Employee Benefits Committee (CEBC) and not the OG constitutes "senior management with the authority to implement the change." If that were the case, the date for serious consideration would actually be later. Regardless, none of the Retirees retired after meeting with the OG; therefore, finding that serious consideration was no earlier than this date is sufficient.

[6] At the trial level, the Retirees also had a claim regarding the retroactivity of any changes, but these claims have been settled and are not the subject of this appeal.

13

going to get" when in fact, something better—VRIP—came shortly after their retirements. Ultimately then, they object that they were not told about VRIP. Consequently, these claims fail for the reasons discussed above. VRIP was not under serious consideration at the time the statements were made. Therefore, AT&T did not breach its fiduciary duty by failing to disclose VRIP.

Alternatively, the Retirees also argue that they were somehow misled as to their existing benefits. Such an argument falls under *Bixler*. Nonetheless, we still affirm the District Court's grant of summary judgement. At the time AT&T made the statements to the Retirees, AT&T believed them to be true. When AT&T provided the Retirees with information about Special Update and the switch to a cash balance plan, the information was accurate. An "honest statement of belief reasonably grounded in fact does not constitute a misrepresentation." *Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 990 (3d Cir. 1995). AT&T did not know about VRIP at the time; therefore, none of its statements regarding Special Update were false.

For the foregoing reasons, the judgment of the District Court is Affirmed.